**GREAT LAKES DREDGE & DOCK COMPANY, Plaintiff–Counterdefendant,**

**The City of Chicago, et al., Plaintiff–Intervenors,**

**· v. ·**

**COMMERCIAL UNION ASSURANCE COMPANY, et al., Defendants–Counterplaintiffs.**

**No. 94 C 2579.**

United States District Court, N.D.Illinois, Eastern Division.

March 26, 1999.

526

Terry M. Grimm, Duane M. Kelley, Jack J. Crowe, Michael V. Hasten, James F. Hurst, Winston & Strawn, Chicago, IL, for Great Lakes Dredge & Dock Company, plaintiff.

Don W. Fowler, Richard Fred Johnson, Richard Edward Mueller, Frederic W. Weber, David M Agnew, Christine J. Siwik, Lord, Bissell & Brook, Chicago, IL, Michael Patrick Hannigan, Connelly & Schroeder, Chicago, IL, Phillip A. Bock, Stein, Ray & Conway, Chicago, IL, for Commercial Union Assurance Company, Ocean Marine Insurance Company, Limited, Sirius (UK) Insurance PLC, Prudential Assurance Company Limited, Pearl Assurance Public Limited Company, Indemnity Marine Assurance Company Limited, defendants.

Don W. Fowler, Richard Fred Johnson, Richard Edward Mueller, Frederic W. Weber, David M Agnew, Christine J. Siwik, Lord, Bissell & Brook, Chicago, IL, for London & Hull Maritime Insurance Company Limited, Sovereign Marine and General Ins. Co. Ltd., Tokio Marine & Fire Ins. Co. Ltd., (U.K.), Northern Assurance Co. Ltd., Scottish Lion Ins. Co. Ltd., Threadneedle Ins. Co. Ltd., Insurance Co. of north America (U.K.) Ltd., Minster Ins. Co., Ltd., Yorkshire Ins. Co., Ltd., Orion Ins. Co. P.L.C., Phoenix Assurance Public Ltd. Co., Norwich Union Fire Ins. Society Ltd., Bishipsgate Ins. Ltd., Sphere Drake Ins. PLC, DIA-Tokyo Ins. Co. (UK) Ltd., Lombard Continental Ins. PLC, Assicurazioni Generali S.P.A., La Reunion Francaise Soc. Anon D'Assurances at Des Reassurances, Hansa Marine Ins. Co. (U.K.) Ltd., Vesta (U.K.) Ins. Co. Ltd., Certain Lloyd's Syndicates Underwriting the Policy Evidenced by Cover Note 91E1979, defendants.

Richard Fred Johnson, Christine J. Siwik, Lord, Bissell & Brook, Chicago, IL, Neal R. Novak, Dan J. Hofmeister, Jr., Michael Lee Tischleder, Brand & Novak, Limited, Chicago, IL, for Yasuda Fire & Marine Insurance Company of Europe Ltd., The Limited, defendants.

Stephen Belgrade, John Andrew O'Donnell, James Kent Minnette, Belgrade and O'Donnell, P.C., Chicago, IL, for Continental Insurance Company, defendant.

William J. Harte, Stephen L. Garcia, William J. Harte, Ltd., Chicago, IL, for Commonwealth Edison Company, counter-defendant.

William J. Harte, Stephen L. Garcia, William J. Harte, Ltd., Chicago, IL, for Kantner & Mattenson, Ltd., Merit Insurance Company, Aera Crockett, MJ Miller & Co. Inc., Edwin J Mills, Richard Cook, Dr., Tiffany Wilson, Le Pecque Women's Apparel, Jac–Lin, Merced E Zuniga, Jolie Mome Inc., Norman C. Berliant, Fish Port, Inc., Hedlund corp., Oriental Electronics, Inc., R & L Fashions, Inc., Royal Redemption Center, Inc., Young Jong, intervenors.

Richard Charles Bollow, Russ M. Strobel, Theodore Robert Tetzlaff, Kenneth A. Kroot, Jenner & Block, Chicago, IL, William J. Harte, Stephen L. Garcia, William J. Hate, Ltd., Chicago, IL, Michael A. Forti, City of Chicago, Department of Law, Chicago, IL, for Donald L Hohman, intervenor.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

GOTTSCHALL, District Judge.

Plaintiff, Great Lakes Dredge & Dock Company ("Great Lakes"), filed this action under the federal Declaratory Judgment Act, 28 U.S.C. § 2201, seeking a declaratory judgment that various insurance policies purchased from a consortium of primarily London-based insurance companies led by the Commercial Union Assurance Company, P.L.C. (hereinafter collectively referred to as "London Insurers") and from Continental Insurance Company ("Continental") indemnify Great Lakes for liability it has incurred or may incur in

litigation arising out of the Chicago flood of April 13, 1992. London Insurers subsequently filed a counterclaim seeking the opposite declaratory judgment. Other parties have joined the lawsuit, including the City of Chicago ("City"), which seeks coverage as an additional insured under the policies purchased by Great Lakes, and various businesses and individuals damaged by the flood ("the underlying claimants"). The court's diversity jurisdiction was originally invoked, but following the Seventh Circuit's opinion in *Indiana Gas Co. v. Home Ins. Co.*, 141 F.3d 314 (7th Cir.1998), the court revisited the issue of jurisdiction and determined that the case falls within its admiralty jurisdiction. Venue is proper in the Northern District of Illinois.

### Factual Background

Great Lakes is in the business of marine excavation with worldwide operations encompassing dredging waterways, renourishing beaches and marine construction. In May 1991, Great Lakes entered into a contract with the City of Chicago in which Great Lakes agreed to replace pilings at five bridges on the Chicago River, including the Kinzie Street Bridge. In the course of its work, Great Lakes removed deteriorating pilings from the riverbed near the Kinzie Street Bridge and installed new pilings by driving them into the riverbed.

During all relevant times, the City owned an underground tunnel system, including a tunnel underneath the Chicago River near the Kinzie Street Bridge. It is undisputed, for the purpose of this declaratory judgment action, that Great Lakes negligently damaged the tunnel while driving pilings during September 1991. It is also undisputed, for purposes of this declaratory judgment action, that the tunnel

damage caused by Great Lakes in September 1991 "progressed,"[1] that at some time the Chicago River began flowing into the underground tunnel, and that as a result of the initial tunnel damage, buildings in the Chicago loop were flooded on April 13, 1992.

The underlying claimants have sued Great Lakes and the City for losses suffered as a result of the flood. The total losses claimed by the underlying claimants exceed $300 million.

In July 1991, Great Lakes purchased primary comprehensive general liability ("CGL") insurance, with a limit of $1 million per occurrence, that provided coverage for the time period July 31, 1991 to July 31, 1992 (the "primary layer"). (Ex. 7102.) Also in July 1991, Itel Corporation ("Itel"), Great Lakes' parent company, purchased two layers of coverage in excess of the primary coverage for the period July 31, 1991 to July 31, 1992. The first layer of excess coverage provided a $40 million limit for excess liabilities arising out of the operations of Great Lakes, written on an occurrence basis, together with additional coverage for Itel and certain specified Great Lakes activities, not at issue here, written on a claims-made basis. (Ex. 7103.) The second layer of excess coverage provided a $60 million layer in excess of both the $40 million first excess layer and the $1 million primary layer. Great Lakes was a named insured, together with Itel, on both excess layers. Although the final policy wording of the $60 million second excess layer has never been agreed upon, all parties agree, for purposes of this litigation, that the wording of the $60 million second excess layer should be considered identical to the wording of the $40 million first excess layer.

1. While this description of the relationship between the tunnel damage in September 1991 and the flood in April 1992 has not been contested in this action, it cannot be determined on this record what happened between the tunnel damage in September 1991 and the flood in April 1992. Insofar as the damage

was "progressive," it appears to have injured only the City until April 13, 1992, the date of the flood, when the Chicago River entered the basements of buildings throughout the Loop. There is no evidence that anyone other than the City sustained injury before April 13, 1992.

When the excess layers were placed for the period July 31, 1991–July 31, 1992, it was anticipated that Great Lakes might be sold by Itel during the policy period. Accordingly, the parties reached an agreement that in the event Great Lakes were sold, London Insurers would "issue, if required, a separate policy with separate limits in respect of Great Lakes International, Inc., et al." *See, e.g.,* Ex. 7103A at LI 00127, LI 006491.

On October 15, 1991, the Blackstone Dredging Partnership L.P. ("Blackstone") purchased Great Lakes from Itel. At that time, London Insurers canceled Great Lakes from the $40 million first layer excess policy, # 90H6337/41–FO33342 (Ex. 7103 at GLDD 13045), and issued a $40 million excess policy numbered # 90H6337/41(a)–FO33983 to Blackstone for the period October 15, 1991–July 31, 1992. (Ex. 7105.) Further, as of October 15, 1991, Itel canceled the $60 million second excess layer and received a refund of the unearned premium. Instead of replacing the $60 million excess policy, Blackstone purchased a substitute second excess layer for the October 15, 1991–July 31, 1992 period from Continental with a $10 million per occurrence limit for the operations of Great Lakes. The Continental policy was a "following form" policy, meaning that it adopted and used the policy wording of the underlying $40 million excess policy. For convenience, the court and the parties have referred to the July 31, 1991–October 15, 1991 period preceding the sale of Great Lakes as the "first period." The period October 15, 1991–July 31, 1992 is referred to as the "second period."

While the only policy that has actually been issued is the first period $40 million first excess layer, the parties agree that for purposes of this action, the relevant coverage wording for all the policies can be deemed to read as follows:

2.  INSURING AGREEMENTS

2.1  Coverage

Underwriters hereby agree, subject to the limitations, terms and conditions hereinafter mentioned, to pay on behalf of the Assured all sums which the Assured shall be obligated to pay by reason of the liability:

(a) imposed upon the Assured by law, or

(b) assumed under contract or agreement (verbal, written or implied) by the Named Assured and/or any officer, director, stockholder, partner or employee of the Named Assured, while acting in his capacity as such

for damages on account of:

(i) Personal Injury

(ii) Property Damage

(iii) Advertising Liability,

caused by or arising out of each occurrence happening anywhere in the world.

(Ex. 7103 at GLDD 13002.)

The excess policies at issue define an "occurrence" as

an accident or a happening or event or a continuous or repeated exposure to conditions which unintentionally results in Personal Injury, Property Damage or Advertising Liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises or location shall be deemed one Occurrence.

(Ex. 7103 at GLDD 13005.)

"Property Damage" is defined as:

(a) physical injury to or destruction of tangible property, including the loss of use thereof at any time resulting therefrom; and/or

(b) loss of use of tangible property which has not been physically injured or destroyed; and/or

(c) evacuation losses arising from actual or threatened physical injury to or destruction of tangible property or bodily injury.

(Ex. 7103 at GLDD 13004.)

The London insurance market is known as a "subscription market," where numer-

ous companies and/or syndicates subscribe to a percentage of each contract of insurance. Coverage is placed through London brokers. In this case, Great Lakes' American broker was Rollins Burdick Hunter ("RBH") and its London broker was Lloyd Thompson Limited ("Lloyd Thompson").

In the London market, a "declaration" is a summary of the terms and conditions of a proposal of insurance. The declaration is prepared by the London broker and submitted to the underwriter, who signifies agreement to the terms of the declaration by placing his initials or "scratch" on the declaration. At a subsequent time the actual policy or "wordings" are prepared.

Declaration No. 41 (Ex. 7161 at LI 001953–54) was the proposal for the $40 million first excess layer for the period July 31, 1991 through July 31, 1992. This insurance was placed under a Facultative Master Liability Slip ("Line Slip") which permitted coverage to be bound upon the agreement of four leading underwriters without submission to all of the "following" underwriters. Declaration No. 41's limit for the coverage at issue here was "US$ 40,000,000 any one occurrence and in the aggregate where applicable." Declaration 41 indicated that the policy to be issued was to follow a standard form, "London 1971," with certain indicated deletions, and was to be "amended as expiring policy." The $60 million second excess layer, because in excess of the $40 million per occurrence limit permitted under the Line Slip, was placed in the open market, requiring Lloyd Thompson to submit the risk to all the underwriters before coverage could be bound.

On August 29, 1991, London Insurers agreed to an endorsement to Declaration No. 41 indicating that Itel had agreed to sell Great Lakes and that London Insurers would "continue coverage hereunder in respect to both Itel Corporation et al and Great Lakes et al, subject to separate policies and statistics...." (Ex. 7161 at L1001960.)

## Procedural Background

In March 1996, pursuant to a referral from District Judge Norgle, Magistrate Judge Lefkow recommended that summary judgment be granted on a number of the parties' policy interpretation claims. On September 11, 1996, Judge Norgle rejected that recommendation and, shortly thereafter, transferred the case to this court. At the parties' request, this court reviewed the prior opinions in this case in an attempt to identify issues for trial and issued Memorandum Opinions on December 19, 1996 and December 20, 1996, opining, in part, that it viewed the September 1991 tunnel damage as an occurrence triggering the first period policies. As the court believes all parties understood, the court agreed to revisit this issue in light of the evidence at trial.

The issues to be decided at this point are as follows: (1) Were the first period policies triggered by the September 1991 tunnel damage and must they respond to the April 1992 flood damage (the issue which the court preliminarily decided in Great Lakes' favor before trial); (2) Should the second period $40 million first excess layer be viewed as a policy separate from the first period $40 million first excess layer so that there are two $40 million first layer limits available to respond to the flood damage; (3) If the second period policies are viewed as policies separate from the first period policies, were the second period policies triggered; (4) If the first and second period $40 million first layer excess policies are separate policies with separate limits, can those policies be "stacked" or "cumulated" so that both must respond to the flood damage, and if so, should damages be allocated to the policy period in which they were sustained;[2] (5) Is the City an additional insured on the excess liability policies; and (6) Is there owners' and contractors' protective insurance ("OCP") coverage avail-

---

**2.** The issue is also relevant to the two second    excess layer policies.

able to the City for the April 1992 flood damage?

### 1. *Must The First Period Policies Respond to the April 1992 Flood Damage?*

In its Memorandum Opinion of December 19, 1996, this court opined that the September 1991 damage to the City's tunnel was an occurrence within the meaning of the excess policies and that the first period policies were required to respond to the April 1992 flood damage sustained by the underlying claimants. The court now reiterates that conclusion.

London Insurers maintain that it is an established principle of insurance law that when occurrence policies define "occurrence" as an accident resulting in property damage during the policy period, "property damage" means "property damage to the claimant." Accordingly, London Insurers argue, only those policies in effect at the time when the complaining party was actually damaged afford liability coverage to the insured with respect to that claimant, regardless of when the insured's negligent conduct first caused injury to a third party. London Insurers thus maintain that even assuming the existence of tunnel damage negligently caused in September 1991, the only party that sustained injury at that time was the owner of the tunnel, the City, and the only damages to which the policies then in effect—the first period policies—must respond (assuming, which London Insurers dispute, that this was an occurrence) are the damages that the tunnel itself sustained. The underlying claimants, London Insurers maintain, were not injured at all during the first period. They were injured only when the flood occurred, in April 1992, and only the policies then in effect would be required to respond to their damage. Essentially, what London Insurers argue is that even though there was property damage to a third party, the City, during the first period, there was no occurrence as to the underlying claimants, and as to any dam-

age they suffered, the first period policies were never triggered. Put another way, London Insurers argue that persons injured after the expiration of a policy period as a result of damage to other persons during the policy period cannot seek coverage under the policy.

The court recognizes, as London Insurers point out, that many cases and treatises assert that only policies in effect at the time a claimant is actually injured are required to respond to the claimant's damages. Most of those authorities address circumstances in which the negligent act complained of and the injury arising from it were separated in time. The principle they establish is that until there is injury, there is no occurrence within the meaning of an occurrence policy such as those here, which define occurrence in terms of property damage and define property damage in terms of physical injury. The court notes, however, that most of those authorities do not focus on the circumstance present here: where physical injury to one third party, and hence property damage to a third party, occurs during the policy period but gives rise to injury to other claimants at a subsequent time.

There are a few decisions that address the occurrence of property damage which is separated in time from the injury to claimants for which coverage is sought and which support London Insurers' position. In *Browder v. U.S. Fidelity & Guaranty Co.*, 873 P.2d 16 (Colo.Ct.App.1993), *aff'd*, 893 P.2d 132 (Colo.1995), USF & G issued an insurance policy which was in effect during the construction of a motel in 1975. In 1976, the Browders bought the motel and the insurance policy was assigned to them. In 1985, construction defects in the motel were discovered. The Browders sued. The appellate court affirmed the grant of summary judgment for USF & G, reasoning that even though there may have been damage to the property during the policy period, the Browders were not damaged during the policy period because they owned no interest in the motel at that

time. In order to trigger an occurrence policy, the court held, there must be actual damage to the complaining party during the policy period. Affirming, the Colorado Supreme Court described as a "basic tenet of liability insurance" the principle that "a third party must suffer actual damage within the policy period to recover under a liability policy." *Browder*, 893 P.2d at 134. Because no third party was injured during the policy period, the court had no occasion to consider the issue of resulting damage.[3]

Another arguably analogous case is *Whittaker Corp. v. Allianz Underwriters, Inc.*, 11 Cal.App.4th 1236, 14 Cal.Rptr.2d 659 (1992). During 1983, while covered by the insurance policy in question, Whittaker changed the composition of its can-sealing compound. One of its customers, American Can, reported leakage of the sealant in 1983, but two other customers, Ball and Reynolds, did not experience difficulties with the sealant until years later. The court held that the Ball and Reynolds claims were not covered by the policy because the time of an occurrence is "when the complaining party was actually damaged." *Id.* at 1241, 14 Cal.Rptr.2d 659. The court observed that there was no proof that the claimants other than American Can incorporated the defective sealant into their products during the policy period, noting that one of the parties, Reynolds, did not even buy the sealing compound during the policy year and the other, Ball, could not determine whether it utilized the defective sealant during the policy period.

In *Whittaker*, unlike *Browder* (where no third party injury occurred during the policy period), one of the third-party claimants suffered an injury during the policy period: American Can incorporated the defective sealant into its products and reported leaks during the policy period. Nevertheless, as to Ball and Reynolds, in the absence of proof that they incorporated the sealant into their products while the policy was in effect, coverage was denied on the grounds that there had been no occurrence as to them during the policy period.

A different approach was taken in *Trustees of Tufts University v. Commercial Union Ins. Co.*, 415 Mass. 844, 616 N.E.2d 68 (1993). Tufts purchased a policy from the Commercial Union, running from July 1, 1968 to November 7, 1972, and a policy from St. Paul, running from November 7, 1972 through July 1, 1975. In 1977, the Jacksonville Electric Authority acquired by condemnation land that had once been owned by a Tufts subsidiary. Jacksonville sued Tufts to recover cleanup and response costs under CERCLA, alleging that during Tufts' subsidiary's ownership, various contaminants had been released into the soil. The trial court granted summary judgment in favor of the insurers, ruling that Jacksonville did not acquire the property until after the expiration of the insurance policies and thus could not have sustained property damage during the policy periods. The Massachusetts Supreme Judicial Court reversed, finding that the terms of the policies required only that property damage occur during the policy period, not that the damage be sustained by the entity making the claim. The court stated:

> The policy language does not require that Jacksonville have a property interest in the contaminated property during the policy period, but only that the property damage itself occur during that time. Had the insurers intended to exclude coverage whenever the underlying plaintiff did not own the property at the time of the occurrence, the insurers could have expressed such an exclusion.

*Id.* at 72. While *Tufts* is readily distinguishable from the case at bar in that the property in question was damaged during

---

3. *Browder* differs from the case at bar in that no third party was injured during the policy period although physical injury to the premises occurred. In the case at bar, the City was injured during the first period.

the policy period (even if the ultimate claimant did not own it at the time), it squarely rejects the proposition that the inquiry in determining whether a policy is triggered is whether the ultimate claimant sustained damage during the policy period. Rather, in the face of policy language which required only property damage during the policy period, the court held that property damage during the policy period, regardless of who owns the property, is the only condition necessary to trigger the policies. *Accord Garriott Crop Dusting Co. v. Superior Court of Kern County*, 221 Cal.App.3d 783, 270 Cal.Rptr. 678, 682 (1990).

■■ In Illinois, it is well-established that where a policy provision is clear and unambiguous, its language should generally be taken in its plain, ordinary and popular sense. *Travelers Ins. Cos. v. Penda Corp.*, 974 F.2d 823, 828 (7th Cir.1992). This principle is subject to the qualification that context, in a contract between sophisticated business entities, should also be considered. *Eljer Mfg., Inc. v. Liberty Mut. Ins. Co.*, 972 F.2d 805, 809 (7th Cir. 1992). Where ambiguities exist in insurance contracts, doubts must be resolved in favor of the insured. *Allen v. Transamerica Insurance Co.*, 115 F.3d 1305, 1309 (7th Cir.1997); *Travelers*, 974 F.2d at 828.[4] Since the policies before the court do not explicitly limit their coverage to accidents or events which cause property damage *to the claimant* during the policy period, this rule of construction would argue against imposing such a limitation.

Resort to this rule of construction, however, does not appear necessary in this case, because the clear policy language, read literally, does not support the position of London Insurers. The underwriters, by the policy language, agree to indemnify the insured for all sums that the insured is required to pay for personal injury and property damage *caused by or arising out of* "each occurrence" (emphasis added). An "occurrence" is defined as an accident or happening or event or continuous or repeated exposure to conditions which unintentionally results in personal injury or property damage during the policy period. Property damage is defined, in relevant part, as physical injury. The definition of property damage is not limited to physical injury during the policy period. The "during the policy period" limitation on property damage is found only in the definition of "occurrence." So if an accident results in physical injury to property during the policy period, there is an occurrence triggering the excess policies, and coverage is provided for personal injury or property damage *caused by or arising out of* the occurrence. The limitation that the London Insurers seek to have the court impose—that the claimant in question must suffer his or her property damage or personal injury during the policy period, rather than suffering property damage *caused by or arising out of* property damage during the policy period—is nowhere stated in or suggested by the policy language.

■ Moreover, since the definition of occurrence makes plain that in order for there to be an occurrence, there must be "[p]roperty [d]amage ... during the policy period," the policies' express coverage of "[p]roperty [d]amage ... caused by or arising out of each occurrence" must encompass *resulting* property damage (not simply the property damage constituting

<hr/>

4. The excess policies in this case were negotiated between sophisticated entities. To the extent that the rule of construing ambiguities in insurance contracts in favor of coverage has its roots in the principle that contracts are generally construed against the drafter, it would arguably not be applicable here. It appears, however, that under Illinois law, the rule of construing ambiguities in insurance contracts in favor of coverage is applied even where the contracting parties are sophisticated entities. *See Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204, 1218–19 (1992). *See also Anetsberger v. Metropolitan Life Ins. Co.*, 14 F.3d 1226, 1231 (7th Cir. 1994). *But see Stone Container Corp. v. Hartford Steam Boiler Inspection & Ins. Co.*, 165 F.3d 1157, 1161–62 (7th Cir.1999).

the occurrence) or the "caused by or arising out of" language would be surplusage. If the insurers intended to limit coverage for such resulting property damage to only such individuals who or entities which themselves sustained damage during the policy period, they need only have said so.

While the matter is not entirely clear, the court believes that its reading of the policy language is also more consistent with the law of Illinois than is the reading advanced by London Insurers. Illinois cases appear in general to read literally the language defining the conditions for triggering an insurance policy and to decline to imply qualifications limiting the policy's coverage.

For instance, as the Seventh Circuit interpreted Illinois law in *Travelers, supra,* Illinois law does not require that the underlying claimant sustain property damage during the policy period for an occurrence policy to be triggered. In *Travelers,* Penda, a commercial plastics extrusion company, supplied its customer, U.S. Sample, with white styrene sheets. Sample hired Bruce Offset Company to lithograph and varnish the sheets. Then Sample affixed color and material swatches to the sheets and bound them into sample books which it delivered to its customer, Joanna Western Mills. Some months later, Joanna informed Sample that the pages had yellowed and refused to pay for the books. Sample sued Penda and Bruce Offset, asserting that the sheets were unusable and unacceptable. Penda requested defense of its claim from Travelers Insurance Companies. Among the arguments asserted by Travelers against coverage was the contention that, under a policy that provided that Travelers would cover any amounts Penda became obligated to pay because of property damage caused by an occurrence, the plaintiff in the underlying suit, Sample, had not sustained covered property damage since, at the time of the yellowing, Joanna rather than Penda owned the books. Looking to the wording of the policy, the Seventh Circuit observed that

the policy covered liability that the insured incurred "because of property damage," and declined to require that the damaged property belong to the plaintiff in the underlying action. *Travelers,* 974 F.2d at 830. The court observed, "Illinois cases do not consider who owned the property in question when determining if a claim is within policy coverage." *Id.*

*Zurich Ins. Co. v. Raymark Industries, Inc.,* 118 Ill.2d 23, 112 Ill.Dec. 684, 514 N.E.2d 150 (1987), established that under Illinois law, an occurrence policy which is triggered by injury is triggered even by non-manifest, microscopic injury. In *Zurich,* the court dealt with an occurrence policy that defined an occurrence as "an accident, including injurious exposure to conditions, which results during the policy period, in bodily injury." *Id.* at 154. The claimants had suffered asbestos-related injury, and the issue was whether inhalation of asbestos fibers or manifestation of asbestos-related disease triggered the policy. After an evidentiary hearing, the trial court concluded that asbestosis begins when a person first inhales asbestos fibers, that the fibers that settle in the small air passages in the lower respiratory tract continuously injure the lung, that the body's futile efforts to ingest the fibers cause additional damage including the formation of scar tissue, that each new inhalation of fibers causes additional damage and that at some time subsequent to the initial exposure, disease manifests itself.

The Illinois Supreme Court held that, according to the unambiguous policy language, " 'bodily injury' is the event which gives rise to the insurers' obligations under the policies." *Id.* at 159. Because the policies defined "bodily injury" as "bodily injury, sickness or disease," and because bodily injury occurred, albeit on a microscopic level, when the asbestos fibers were first inhaled, the court held that "an insurer whose policy was in force at the time a claimant was exposed to asbestos must provide coverage." *Id.* at 160.

The Illinois case which most strongly supports London Insurers' position is *Pekin Ins. Co. v. Janes & Addems Chevrolet, Inc.,* 263 Ill.App.3d 399, 200 Ill.Dec. 843, 636 N.E.2d 34 (1994). In *Pekin,* a fire and explosion on March 28, 1990 destroyed a warehouse that stored chemicals and fertilizer; the water sprayed on the warehouse to extinguish the fire resulted in contamination to the surrounding water and soil. Myers, the warehouse owner, sued the owners of an adjacent automobile dealership, claiming that they had allowed petroleum products to accumulate on the ground, that the petroleum had contaminated Myers' adjoining land, and then, when the dealership's employees burned garbage, the accumulated petroleum which had seeped onto Myers' property ignited, causing the warehouse fire and the resulting damage.

Pekin had issued two policies to Janes & Addems, the automobile dealership, one from January 1, 1989 through January 1, 1990 and one from January 1, 1990 through February 23, 1990, both of which expired before the occurrence of the fire. Because the policies covered property damage, defined as physical injury to or destruction of tangible property during the policy period, and because both policies had expired before the fire occurred, Pekin argued that there was no coverage. Other insurance companies which had issued similar policies which were not in effect at the time of the fire also sought a declaration of no coverage.

The court held that while there may have been damage to Myers' property during the policy period in the form of petroleum contamination of his soil, this was not the property damage for which Myers sought recovery. *Pekin,* 200 Ill.Dec. 843,

636 N.E.2d at 38. Rather, the property damage which formed the basis for Myers' claim was the damage caused by the fire, and the fire occurred after the expiration of the policies. *Id.* The *Pekin* court actually went further than London Insurers asks this court to go by holding that injury to the claimant during the policy period does not trigger the policies for resulting but qualitatively different damage to the same claimant at a later time.

*Pekin* has been criticized as inconsistent with *Zurich,* including by its own dissent, and if its reasoning were applied to this case, there would be a substantial question whether the progressive damage to the tunnel wall which ultimately manifested itself in the flood could be viewed as triggering coverage for the underlying claimants.[5] But even by its own terms, *Pekin* cannot be read so broadly. The court explicitly limited its holding to the wording of the general liability policy before it, distinguishing the coverage provided by occurrence policies:

> Plaintiffs argue under *Zurich* coverage under a general liability policy is triggered, not when the wrongful conduct takes place, but when the complained-of damage occurs. This is contrasted with the protection provided by an "occurrence" or "acts and omissions" policy, which provides coverage for the negligent acts or omissions which occur during the policy period, regardless of when the injury occurs or the claim is made. In this case, the insured was covered under a general liability policy and coverage is triggered when the injury occurs.

*Pekin,* 636 N.E.2d at 38 (citations omitted).[6] Whatever the correctness of *Pe-*

---

**5.** It appears to this court that an analysis similar to that adopted by the court in *Pekin* was expressly rejected by the Illinois Supreme Court in *Zurich.* In *Zurich,* one of the defendants, Federal Insurance Company, argued that coverage is triggered only when the claimant shows evidence of the specific disease for which he seeks damages, not when his body is contaminated by the agent that

will ultimately cause the disease. *Zurich,* 112 Ill.Dec. 684, 514 N.E.2d at 157. This argument was considered and rejected by the Illinois Supreme Court. *Id.* at 160–161.

**6.** The *Pekin* court appears to construe the policy before it as if it were a claims-made policy, which it does not appear to be, and its description of occurrence policies as requir-

*kin's* interpretation of the policies before it, there is no question that the *Pekin* policies were materially different from the policies at bar, which everyone agrees reach damage to a given claimant resulting from damage to that claimant during the policy period.

The court and the parties have reviewed the law of other states and have not found analogous cases. Having reviewed the Illinois case law, this court is persuaded that the proper approach is to apply the clear words of the policies and to decline the invitation to engraft onto those policies exceptions to limit coverage. The first period policies were triggered by the September 1991 damage to the tunnel and they must respond to the resulting April 1992 flood damage sustained by the underlying claimants.[7]

### 2. *Is There One First Layer Excess Policy or Two?*

When Itel sold Great Lakes to Blackstone on October 15, 1991, London Insurers, pursuant to their previous agreement, canceled the first period first layer excess policy which insured Itel and Great Lakes, Ex. 7103, and issued a separate policy, Ex. 7105, the second period first layer excess policy insuring Blackstone and Great Lakes. Great Lakes argues that these two first layer excess policies, the first in effect at the time Great Lakes damaged the tunnel and the second in effect at the time of the flood, should be viewed as two independent policies, providing two $40 million per occurrence first layers of coverage rather than one. London Insurers maintain that there was in effect only one first excess layer with a single $40 million limit for the period July 1991 to July 1992.

As early as 1990, in discussions leading to the binding of insurance for the 1990–91 policy year, Itel and Great Lakes informed London Insurers that Great Lakes might be sold and that, in the event of a sale, Great Lakes wanted to sever the coverage for Great Lakes and Itel and obtain a separate policy for Great Lakes. (Tr. 221, 669.) The "slips" by which London Insurers agreed to bind insurance for the 1991–92 policy year stated, "Agree issue, if required, separate policy with separate limits in respect of Great Lakes International, Inc., et al." *See, e.g.,* Ex. 7103A at LT00127 (first period first excess layer); Ex. 7106F at LI 005368 (first period second excess layer). The meaning of the "separate policy with separate limits" language is at the center of this dispute.

In anticipation of the sale of Great Lakes which took place in October 1991, Great Lakes considered a number of options for restructuring or replacing its excess coverage. Ultimately, with respect to the first excess layer, the decision was made to take the option of a separate policy for Great Lakes with London Insurers, as had been agreed would be possible at the inception of the policy period. With respect to the second layer, it was determined that, having eliminated Itel and its

ing only negligent acts and not injury within the policy period is contrary to the provisions of the occurrence policy in this case as well as to those in most of the reported cases, including *Zurich*. This is pointed out by the dissent but not acknowledged by the majority.

7. The court finds unpersuasive the argument that this holding will expose insurers to liabilities arising long after a policy has lapsed. To the extent the insurers are concerned that they will be held liable when injuries caused during the policy period become manifest only later, that result is required both by the wording of these policies and by *Zurich*. The cases in which an injury occurs during the

policy period but its manifestation is delayed are few and far between, and the situation here, where a non-manifest injury to one claimant during the policy period results in injury to another claimant at a later time are so rare that no one in this litigation has found closely analogous precedent. As *Zurich* makes clear, however, such concerns do not justify a departure from the plain wording of the policy. *See also Eljer,* 972 F.2d at 811–12. If insurers wish to limit their exposure to the time when damage becomes manifest or to the time the claimant is injured, they can easily so specify.

non-marine exposures from the package, it would be possible to move the second layer excess program to a United States marine insurer. Great Lakes accordingly did not replace its $60 million second excess layer with London Insurers but purchased a second excess layer from Continental for the October 15, 1991 through July 31, 1992 period, reducing the amount of coverage from $60 million to $10 million. (Ex. 491.) Pursuant to its agreement with London Insurers, if Great Lakes on the occasion of its sale had wished to purchase a second layer of excess coverage, it could have obtained a separate $60 million excess layer for the second period from London Insurers, obtained a policy with a lower limit in the London market or bought a second layer of excess coverage elsewhere. It chose the third option.

Accordingly, Great Lakes' coverage was canceled under the first period $40 million first layer policy as well as under the first period $60 million second layer policy. (Tr. 125–26.) The cancellation endorsement for the first period $40 million policy reads: "It is hereby noted and agreed that effective 15th October, 1991 coverage hereunder in respect of Great Lakes Dredge & Dock Company et al is canceled. Agree return pro rata of US$ 615,000 per annum." Ex. 7103 at 13045. Similar language was used in the cancellation endorsement for the second layer. Ex. 7152 at 6217. On December 5, 1991, Lloyd Thompson issued a cover note evidencing the binding of $40 million excess coverage for Blackstone and Great Lakes for the period October 15, 1991 to July 31, 1992. (Ex. 7167B.) The $60 million second layer was replaced by a $10 million Continental policy. (Tr. 125–26.) With respect to the first layer, Itel received a return of unearned premium for the balance of the policy year, October 15, 1991 to July 31, 1992, in the amount of $426,195, and Lloyd Thompson billed Blackstone precisely that amount as premium for the newly-issued Great Lakes–Blackstone policy. (Ex. 7167A at RHH 03912; Ex. 7167B at 03919.) Policy number 90H6337/41 ($40

million first excess layer) and cover note 91E1979 ($60 million second excess layer) remained in effect for Itel for the balance of the policy year. Ultimately, on July 15, 1992, with respect to the first layer, two policies were issued, one for $40 million coverage for Great Lakes and Itel for the period July 31, 1991 to July 31, 1992 (90H6337/41) and one for Great Lakes and Blackstone in the same amount for the period October 15, 1991 through July 31, 1992 (90H6337/41(A)).

It cannot be disputed that the first and second period *second* excess layer policies are separate policies with separate limits, since they are issued by different insurers and provide for different amounts of coverage. London Insurers maintain, however, that with respect to the $40 million first layer, there is in actuality only one $40 million limit per occurrence. London Insurers argue that the manifest intent of the parties was that, upon the sale of Great Lakes, Great Lakes would have the option of a *continuation* of coverage and that a continuation of coverage was all that was accomplished by the issuance of the second first layer policy. It is not clear, however, from the fact that Great Lakes wanted to be able to "continue" coverage, that the parties had formed an intention to continue the existing policy under a new number as opposed to continuing the same coverage by issuance of a separate policy providing the same limits. The "continuation" language relied on by the London Insurers does not resolve this issue.

As part of its argument, London Insurers asks the court to construe the language "separate policy with separate limits in respect of Great Lakes" as meaning not that Great Lakes was entitled to a new policy with a $40 million limit separate from the first period policy's $40 million limit—the interpretation that Great Lakes advances—but that Great Lakes was entitled to continue its coverage with a $40 million limit separate from the limits continuing to cover Itel. As stated in London

Insurers' Proposed Findings of Fact # 28, "London Insurers did not agree to two separate policies for Great Lakes, but rather agreed that Great Lakes and Itel could each have separate policies if they chose to do so."

London Insurers argue that the transaction makes no economic sense if the second period policy is seen as giving Great Lakes another $40 million in coverage for no additional premium. After Great Lakes was sold, Lloyd Thompson, Great Lakes' London broker, issued a $426,195 return of premium to Itel representing that portion of the $950,000 annual premium that was attributable to the remaining 9½ months of Great Lakes' coverage under the policy. Lloyd Thompson then charged Blackstone precisely that premium to cover Great Lakes for the 9½ months of the second period. London Insurers argues that this demonstrates that the coverage that Great Lakes had when it was owned by Itel would continue for the remaining months of the July 31–July 31 policy year. London Insurers contends that it is absurd for Great Lakes to argue that the premium negotiated to cover one $40 million limit of coverage should now provide two $40 million limits or a total of $80 million in coverage.

There are, however, a number of responses to London Insurers' argument. First, Thomas Ptacek, who handled the Great Lakes account for RBH, testified that for both the 1990 and 1991 policy years, the issue of severability was a central aspect of the parties' negotiations and Ptacek "understood the premium to include consideration for the underwriter's agreement to issue a separate policy should Great Lakes and its purchaser require that." (Tr.255) [8] Second, it must be

borne in mind that the first period first excess layer provided a limit of $40 million not in the aggregate (except as to products liability) but per occurrence; it was within the realm of possibility under the first period policy that London Insurers might have to pay out more than $40 million (although manifestly not for one catastrophic occurrence). Third, trial testimony indicated that the reason it was so important for Great Lakes, in the event of its sale, to be able to obtain separate coverage was because it did not want to share a limit with Itel; whatever the second period $40 million first layer policy accomplished, it clearly accomplished that Great Lakes' policy limit would be independent of Itel's, creating the possibility of increased liability for the insurers.

Finally, from the point of view of the parties as of October 15, 1991, the first period policies had not been triggered, and canceling them and providing a separate policy at the same premium for the balance of the policy year would not appear to subject the insurers to potential double liability. They may simply have overlooked the possibility of latent damage and the importance, in view of that possibility, of doing something other than issuing a separate, freestanding second period policy. Julian Garrish of Lloyd Thompson, Great Lakes' London broker, so suggested, testifying that the cancellation of one policy and its replacement by another for the duration of the original policy period, with no additional premium, makes sense from a prospective perspective rather than from the perspective of hindsight: "What they did was to judge that the premium for Great Lakes' exposure going forward into the second period was—should be

8. Great Lakes introduced evidence that in the 1990–91 policy year, when London Insurers were told that Itel might sell Great Lakes, Itel paid $900,000 for $50 million in first layer excess coverage. In 1991–92, when the possibility of a sale was communicated to London Insurers as likely, Itel paid $950,000 for $40 million in coverage. (*See generally* Tr. 402–

07.) Great Lakes argues that the fact that it paid a greater premium for less coverage for the 1991–92 policy year evidences that it paid for the option of a second, separate policy in the event of a sale. The court finds this evidence too vague to provide a foundation for such a finding.

identical to the premium that had already been calculated for that." (Tr. 532.)

In summary, the interpretation of the "separate policy with separate limits" language that London Insurers urges—that Great Lakes would be canceled from Itel's policy and would be permitted to continue coverage under a policy separate from Itel's with a limit separate from Itel's, but limited to the single $40 million available under the original policy—is a reasonable interpretation. But Great Lakes' interpretation of this language is also reasonable, entirely consistent with the documents in evidence and not so inherently outrageous in light of all the evidence that it must be categorically rejected.

London Insurers further argue that under the various London market documents that manifest the binding of insurance for the initially-agreed July 1991–July 1992 period, only one $40 million per occurrence limit was contractually possible. The evidence at trial concerning facultative master slips and declarations, which must be understood if this argument is to be understood, was, to say the least, vague and confusing, in all likelihood because these documents reflect a traditional course of dealing in the London insurance market, the legal status of which under American contract law is obscure. According to London Insurers, a "declaration" is a summary of the terms and conditions of a proposal of insurance which, when agreed to by all the parties, becomes the operative contract of insurance. *London Insurers' Proposed Finding of Fact # 18.* The testimony on which the proposed finding as to the contractual status of the declaration is based, however, provides uncertain support for it. Robert Jones, who is em-

ployed in the underwriting room at the Commercial Union, testified that the broker attempting to place insurance would write the conditions of insurance that had been agreed to in conversations with the underwriter on a "slip." The broker would then produce a policy, a "wording which reflected the coverage." The wording would, however, have to be approved by the underwriters who, after taking time to review it and perhaps negotiate further, would sign it and return it to the broker.

Ex. 7103A contains Declaration No. 41, the declaration underlying the first period first $40 million excess layer. (Ex. 7103A at LI006490.) That declaration provides a limit of $40 million per occurrence. London Insurers argue that because there was no new declaration for the second period first excess layer, all the insurance that Great Lakes could obtain for the period July 31, 1991–July 31, 1992 was $40 million per occurrence because that is all the underwriters had agreed to provide. But the same declaration contains a section called "General Conditions," and among the General Conditions is the precise language in question: "Agree issue, if required, separate policy with separate limits in respect of Great Lakes International, Inc. et al." Ex. 7103A at 1006491. So if any underwriter examined the declaration in order to assess the risk, it would be aware of the controverted "separate policy with separate limits" language, whatever it means. The court concludes, therefore, that even if the declarations and slips involved in the placement of insurance in this case are contractually binding on the parties, they do not resolve this issue in London Insurers' favor.[9]

---

**9.** The court is skeptical of the argument made by London Insurers that the declaration is the contract. After the declaration had been issued and the underwriters had approved it, the actual policy, "the wordings," had to be prepared by the London broker and approved by the lead underwriter[s]. The parties in the London market expect that the policy wordings will agree in essential particulars with the declaration, and there is frequently a long delay, following the declaration, before the wordings are issued. Nevertheless, the parties appear to treat the policy as the contract, and no case has been cited to this court in which a court interpreted the provisions of a declaration to determine the extent of coverage. In this case, since the controverted policy language is also contained in the declaration, there is no need to resolve this question.

The court thus turns to the plain language of the policies. Two separate policy documents were issued by the Institute of London Insurers: (1) 90H6337/41, for the one-year period beginning July 31, 1991 (Ex. 7103); and (2) 90H6337/41(a), for the period October 15, 1991 to July 31, 1992. (Ex. 7105.) The policies have different named insureds: in one case Itel Corporation and its affiliates, and in the other, the Blackstone Dredging Partnership and affiliates. The annual premiums under the two policies are different: $615,000 for section 1 and $335,000 for section 2 in the Itel policy and $553,000 per annum for the Blackstone policy. Each policy states, "THE RISK AND SUM INSURED HEREUNDER [is] 100% of limits as stated in the attached wording." (Ex. 7103 at 12998; Ex. 7105 at 12361.) The policy wordings differ in a number of respects, including the omission in the second period policy of Section 2, the claims-made coverage section which in the first period policy covered liabilities other than those arising from Great Lakes' maritime operations. The policies do not reference one another, so there is nothing on the face of the second period policy which suggests that its coverage is in any way limited by any other policy. Moreover, testimony established that it is the practice of the insurance industry that if two policies are intended to share one limit, they will reference that point for the insured. (Tr. 528.) Indeed, the testimony of London Insurers' own witnesses makes clear that based upon the controverted "separate policy with separate limits" language and the provisions of the second period policy, there is at the very least substantial ambiguity as to whether there were two $40 million policies or one. Brian Cheney, the Commercial Union's senior underwriter, testified in his deposition that the two policies appeared to be separate policies. (Cheney Dep. at 34–36.) Graham Hensman, the leading underwriter on this placement, testified that the language "Agree issue, if required, separate policy with separate limits" means "that you

have two policies and that each policy has the benefit of the limit contained in that policy wording." (Hensman Dep. at 124–25.)

Just as with the issue of the trigger of coverage, the court concludes that its foray into extrinsic evidence has done nothing to shed light on the meaning of the controverted "separate policy with separate limits" language. The policies' express language supports the view of Great Lakes that there are two separate policies, one running from July 31, 1991 until July 31, 1992, which was canceled as to Great Lakes as of October 15, 1991, and one running from October 15, 1991 until July 31, 1992. Nor is there anything in the language of these policies which suggests that they share one $40 million limit; to the contrary, the policies each state, as set forth above, that "[t]he risk and sum insured hereunder [is] 100% of limits as stated in the attached wording." Finally, to the extent that this conclusion is not clear from the policies, then the policies are at the very least ambiguous and must be construed in favor of Great Lakes, requiring, similarly, that they be viewed as two separate policies, one covering the period July 31, 1991 to October 15, 1991, and the other covering the period October 15, 1991 to July 31, 1992. For all these reasons, the court concludes that the first period and second period $40 million first excess layer policies were separate policies with two $40 million limits.

### 3. Were the Second Period Policies Triggered?

The four excess policies in this case cover "property damage . . . caused by or arising out of each occurrence," which is defined in turn as "an accident or a happening or an event or a continuous or repeated exposure to conditions which unintentionally results in . . . [p]roperty [d]amage . . . during the policy period." Manifestly, the flood was an event which unintentionally resulted in property damage during the second period policy period.

■ London Insurers, who took the position essentially from the time of the flood that the second period policies were applicable to the damage caused by the flood, now seek to interpret the court's prior opinion finding that the September 1991 tunnel damage triggered coverage under the first period policies as defining the trigger of coverage as the *causative* event. The court did not so decide. Rather, the court found that the first period policies were triggered because there was property damage during the first period. Property damage during the policy period, not causation, is the trigger of coverage for all these excess policies.

■ Although except for Continental[10] the parties have not argued that in view of the court's conclusion that the first period policies were triggered, it should find that the second period policies were not triggered, the case law suggests that the facts here raise an issue as to whether there were one or multiple occurrences. *See generally Appalachian Ins. Co. v. Liberty Mutual Ins. Co.*, 676 F.2d 56, 60 (3d Cir. 1982) ("[T]he determination of whether an occurrence is single or multiple properly depends on whether there is a single cause or multiple causes for the loss sustained.")[11] London Insurers, while not arguing that the second period polices were not triggered, contend that if both the first

and second period policies were triggered, the court should allocate damages by policy period, limiting the coverage of the first period policies to the City's tunnel damage and relegating the underlying claimants to the second period policies with their smaller combined limit. Continental, which provided only the second excess layer for the second period, argues that only the first period policies were triggered.

The court finds that the September 1991 tunnel damage and the April 1992 flood each qualify as an occurrence triggering, respectively, the first and second period policies. The concept that, under an occurrence policy which is triggered by injury or damage, injury which occurs over successive policy periods triggers successive policies is well-established under Illinois law. *See Zurich Ins. Co. v. Raymark Industries, Inc.*, 118 Ill.2d 23, 112 Ill.Dec. 684, 514 N.E.2d 150, 159–60 (1987). The instant case is unusual in that there was no causative conduct by the insured during the second policy period: the April 1992 flood was the result of the progression of the first period property damage. In view of the policies' clear language, however, that an "event" or "happening" which causes property damage during the policy period is an occurrence, the court must conclude that whatever occurred on April 13, 1992 which caused water to enter and damage structures throughout the Loop

---

10. Continental appears in recent briefing to have changed its position from the posture it took before trial.

11. As several cases have recognized, determining how many occurrences took place is not a straightforward matter, and the case law has not produced any consistent principle of decision. In this case, only Continental has taken the position that there was only a single occurrence, in September of 1991 (which can be argued based on the fact that all the injuries in this case derived from the September 1991 causative event), and no one has argued that there were more than two occurrences, one in September 1991 and many in April 1992 (based on the many individual injuries that occurred). Rather, London Insurers has argued that there was one occurrence, in April 1992, and Great Lakes has argued that there were two occurrences,

one in September 1991 and one in April 1992. In *Lee v. Interstate Fire & Cas. Co.*, 86 F.3d 101, 104–05 (7th Cir.1996), the Seventh Circuit expressed skepticism about the approach of cases that treat multiple injuries resulting from one cause during one policy year as one occurrence and multiple injuries resulting from one cause over multiple policy years as multiple occurrences. *See, e.g., Society of the Roman Catholic Church v. Interstate Fire & Cas. Co.*, 26 F.3d 1359, 1365 (5th Cir.1994). The Seventh Circuit commented that "[a] single negligent act undoubtedly can produce multiple 'occurrences' *if the injuries are independent....*" *Lee*, 86 F.3d at 104 (emphasis added). The Seventh Circuit did not specify what it meant by "independent," although it gave as an example a single negligent act that injures many victims.

qualifies as a triggering event or happening for purposes of the second period policies.

The policies' qualifying language, "All such exposure to substantially the same general conditions existing at or emanating from one premises or location shall be deemed one Occurrence," supports the finding of an occurrence on April 13, 1992. While no evidence has been presented as to what caused the entry of flood waters into the basements of the Loop on April 13, it must be assumed that some event of significance happened at or around that date, and at or around the site of the September 1991 tunnel damage. Although it is possible that water entered the tunnel prior to April 1992, and that *that* water entered the Loop buildings on April 13, the fact that all the affected premises were simultaneously flooded on April 13 renders extremely unlikely the possibility that all that happened on April 13 was that the walls of all those buildings were simultaneously breached by water that had been entering the tunnel since September. Rather, the court must assume, in the absence of evidence suggesting any other hypothesis, that on or about April 13, 1992, there was some massive entry of river water into the tunnel system, emanating from the site of the original tunnel damage, which had the force to break simultaneously into all the Loop basements. Once it is assumed that something happened at the site of the original tunnel damage on or about April 13 to allow large amounts of river water to enter the tunnel and ultimately the Loop buildings, it is clear that there was an "event" or "happening" on April 13 and that the flooding throughout the Loop resulted from "exposure to substantially the same general conditions existing at or emanating from one premises or location." Under the policies, the April 1992 flood was clearly a triggering occurrence.

Because all ensuing damage derived from the initial September 1991 tunnel damage, it is possible to argue that the damage all flowed from that one location and that one cause. Yet, as Great Lakes has pointed out, every expert who testified at trial agreed that the April 1992 flood triggered the second period policies. *See* Windt (Tr. 578); Zeitler (Tr. 700–01); Wilson (Tr. 1272–73). This was also the position taken by John Weber, Continental's Rule 30(b)(6) witness. (Weber Dep. at 37–38, 40.) *See also* Ex. 8615, a Rule 26(2) disclosure on behalf of Continental, in which an expert for Continental opined that "[a]ll five policies [including the primary] provide coverage for this loss so there is $151 million in applicable coverage." [12] There is thus substantial support for the conclusion that a finding that the first period policies were triggered by the September 1991 property damage does not preclude a finding that the second period policies were triggered by the April 1992 flood. The language of the policies is consistent with this conclusion, and the permissibility of multiple triggers, in an appropriate case, is clear under Illinois law. *See Zurich*, 112 Ill.Dec. 684, 514 N.E.2d at 159–60. The court accordingly concludes that the flood was a triggering event under the excess policies.

### 4. May the First and Second Period Policies Be "Stacked," That Is, Can Great Lakes Obtain Coverage Under Both the First and Second Period Policies?

The court's holding that the policies of both periods were triggered does not decide the question of whether the policy limits for both periods may be cumulated or "stacked" so that the claimants may have the benefits of all four policies' limits. It is to the permissibility of stacking that the court now turns.

**12.** Continental asserts that it withdrew this expert. *See* Continental Insurance Company's Responsive Post–Trial Memorandum, at

3 n. 1. The evidence, at any rate, is cumulative.

Although the policy language of all four policies at issue was largely adopted from an insurance industry form referred to as the "1971 London Form," none of the policies contains the form's standard "Prior Insurance and Non Cumulation of Liability" clause, which reads as follows:

It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Assured prior to the inception date hereof the limit of liability hereon as stated in item 2 of the Declarations shall be reduced by any amounts due to the Assured on account of such loss under such prior insurance.

(Ex. 7104 at 5153.) The purpose of this "anti-stacking" clause, according to Brian Cheney, the senior underwriter for marine business at the Commercial Union, is to prevent the insured from taking advantage of the second triggered policy when property damage that takes place in two different policy periods triggers both policies. (Cheney Dep. at 40–41.)

The anti-stacking clause of the 1971 London form was deleted from the Great Lakes policies for 1990–91, as well as from the policies that were issued for 1991–92. Thomas Ptacek, who managed the Great Lakes account for Great Lakes' American insurance broker, RBH, testified that he had previously, in conjunction with Lloyd Thompson, used "manuscript wording," meaning wording amending the 1971 London form, in obtaining coverage for another client, Koch Industries, in the London market. Koch Industries, a chemical company, had for many years negotiated with the Commercial Union for the omission of the anti-stacking clause in its coverage whenever possible. (Tr. 700–04.) In April 1990, Ptacek, having joined RBH and having assumed responsibility for the Great Lakes account, went to London to meet with Lloyd Thompson to discuss obtaining excess coverage for Itel/Great Lakes. (Tr. 207.) Ptacek and Julian Garrish of Lloyd Thompson used as draft wording for the Itel insurance they hoped to obtain the

manuscript wording that they had used on behalf of Koch Industries. This manuscript wording, which the London marine market, including the Commercial Union, had previously accepted for Koch Industries and other clients, omitted the form non-cumulation clause. (Ex. 7175; Tr. 211–12.) Ptacek was confident that the London Insurers would accept a manuscript wording for Itel/Great Lakes. (Tr. 212.)

There is no evidence of record indicating that the brokers and the underwriters discussed the omission of the non-cumulation of liability clause. The record does indicate, however, that the absence of discussion at the insurance placement stage is not unusual in the London market. Ptacek testified that although certain requirements such as the need for separate policies if Great Lakes were sold were explicitly discussed, when the underwriters "scratched" (initialed) the placement slip, they were agreeing that the underwriters, the broker and the insured would work to develop an agreed wording which would form the basis of the policy. (Tr. 226.)

In late 1990, Ptacek sent his proposed wordings for excess coverage to begin July 31, 1990 to Garrish for his review. In due course Lloyd Thompson submitted the wordings to the Commercial Union. The evidence indicated that it was common for the underwriters to call with questions about the wordings or for negotiations over the wordings to take place at this stage. In this case, according to Ptacek, substantial negotiations had previously taken place and there were no further negotiations before the wordings were approved. (Tr. 247.) The wordings were scratched on May 8, 1991, indicating the Commercial Union's agreement, and they included no prohibition of cumulation, in keeping with Great Lakes' desire that stacking be allowed. (Tr. 230–32.) In due course, the policy, Ex. 7169, was issued by the Institute of London Underwriters, bearing the scratch of Peter Evans of the Commercial Union.

In late spring and early summer of 1991, Ptacek, a representative of Lloyd Thompson and Graham Hensman of the Commercial Union met to discuss the renewal of the Itel/Great Lakes excess program for 1991–92. Again, there were discussions relating to the possible sale of Great Lakes. This time, although the initial placing slip had provided for a $50 million first excess layer and a $50 million second excess layer, as had been the coverage in the 1990–91 year, the London underwriters would agree to only a $40 million first layer, so a 40–60 arrangement was worked out. (Tr. 238.) In addition, the underwriters required that certain parts of the exposure (none of which are at issue here) be written on a claims-made rather than an occurrence basis, requiring that the policy be broken into two sections. Beyond this, it was agreed that the prior year's wordings would be carried forward. (Tr. 253.) The final placement slip for the 1991–92 year thus indicated, "As per umbrella policy (London 1971) LPO 354B (⅜₆) with exclusion b) and watercraft exclusion deleted and amended as expiring policy." (Ex. 7103A at LT00126.) The language, "amended as expiring policy," represented an agreement to adopt for the 1991–92 policies the same manuscript changes from the 1971 London form as had been used in the 1990–91 policies. (Tr. 252.)

In the face of the absence of the form anti-stacking clause from both the 1990–91 and 1991–92 policy wordings, as well as the evidence that Great Lakes intentionally proposed wordings without the clause in order to permit stacking, London Insurers argue that the underwriters were unaware of the omission of the anti-stacking clause. They further argue that cumulation of the policy limits is impermissible regardless of the absence of the non-cumulation clause because each policy must respond only to the extent of the damage that took place during its policy period.

The policies at issue here do not on their face prohibit the triggering and cumulation of successive policies. Therefore, if both the first and second period policies were triggered, as the court has found they were, both the first and second period policies would appear required to respond to the flood damage.

London Insurers have provided the court with no basis for implying a prohibition against stacking. They do not argue that there was any fraud involved in the omission of the anti-stacking clause. Rather, they maintain that the wordings for the 1990–91 policy year were significantly different from the 1971 London form in particulars not specified on the declaration for that policy year, Declaration No. 35, and that Robert Jones, who initialed and approved the 1990–91 policy wordings on behalf of the Commercial Union, did not compare the wordings with the umbrella form and "was unaware of the changes which had been made, including the omission of [the anti-stacking clause]." *London Insurers' Proposed Findings of Fact,* ¶ 48. London Insurers assert that had they been aware of these changes, they would not have approved the 1990 wordings. *See London Insurers' Proposed Findings of Fact,* ¶ 49.

It is presumed under Illinois law that a written agreement expresses the parties' mutual intentions, and this presumption will not be overturned unless the evidence to the contrary is clear and convincing. *Suburban Bank of Hoffman–Schaumburg v. Bousis,* 144 Ill.2d 51, 161 Ill.Dec. 289, 578 N.E.2d 935, 939 (1991). The absence of limiting language when such language could easily have been inserted suggests that the limitation was not intended. *See id.* The evidence in this case is clear that Great Lakes wanted to omit the anti-stacking clause so that stacking would be permitted. London Insurers do not argue that there was a mutual mistake or fraud or anything else that would make this case anything other than, at best, a case of unilateral mistake. Absent proof of fraud in the execution or fraud in the inducement, a party will not be excused from an agreement he executed

merely because he claims to have been unaware of what he was agreeing to. *See Rudolph v. Santa Fe Park Enterprises, Inc.*, 122 Ill.App.3d 372, 78 Ill.Dec. 38, 461 N.E.2d 622, 625 (1984). Accordingly, the court will not imply a prohibition against stacking in these policies.

Even absent a contractual prohibition against stacking, London Insurers argue that the cumulation of the limits of the successive policies is prohibited by a principle of Illinois law they describe as follows: "[W]here continuing property damage triggers successive policies in successive policy periods, discrete and separable damage is allocated to that policy period in which it occurs. If the damage cannot be separated, divided or allocated, then each insurer's share of the risk is determined by a time-on-the-risk formula, and these rules apply regardless of whether the policies contain an anti-stacking clause or not." *London Insurers' Proposed Conclusions of Law and Memorandum in Support Thereof* at 8.

*Zurich Ins. Co. v. Raymark Industries, Inc.*, 118 Ill.2d 23, 112 Ill.Dec. 684, 514 N.E.2d 150 (1987), is the leading Illinois Supreme Court authority on the interpretation of occurrence policies in the context of continuing damage over successive policy periods. The policies in *Zurich* provided for coverage in the case of bodily injury, sickness or disease during the policy period. The trial court determined that in the case of the asbestosis claims for which coverage was being sought, bodily injury occurred simultaneously with, or shortly after, inhalation of asbestos fibers, disease occurred when disease became manifest to the point where it could be diagnosed and in between these events, when the body was in a weakened or unsound condition, there was sickness. *Id.* at 152–53. The court further determined that all three of these events were triggers under the policies. *Id.* at 152. The Supreme Court agreed with this "triple trigger" approach and held in addition that the appellate court correctly concluded that the policies'

language that the carriers were obligated to pay "all sums" which Raymark became obligated to pay as damages because of bodily injury, sickness or disease meant that each carrier whose policy was triggered was jointly and severally liable for the total indemnity and defense costs of a claim without proration. *Id.* at 165.

London Insurers rely primarily on *Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 283 Ill.App.3d 630, 219 Ill.Dec. 62, 670 N.E.2d 740 (1996) for the argument that proration among policies is required in the case at bar. In *Outboard Marine*, Outboard Marine Company ("OMC") operated a die-casting facility in Waukegan at which, from 1953 to 1976, a hydraulic fluid called Pydraul was utilized. Pydraul contained PCBs, an environmental contaminant, and during this time period, Pydraul was discharged into Waukegan Harbor and other surrounding areas. Federal and state environmental agencies sued OMC to compel environmental remediation. OMC then sued Liberty Mutual Insurance Company ("Liberty"), Commercial Union Insurance Company ("Commercial Union") and Insurance Company of North America ("INA"), alleging a duty to defend and indemnify in connection with the remediation litigation. The policies in question were occurrence policies and contained non-cumulation of liability clauses.

The trial court found that OMC's contamination of Waukegan Harbor constituted a single continuing occurrence which took place between 1953 and 1976, and that the continuing occurrence triggered coverage under each of the defendants' policies. *Id.* at 746. The court concluded that it was impossible to allocate damages for any given year with any degree of certainty and accordingly applied a pro rata "time-on-the-risk" approach to the allocation of damages. *Id.*

Relying on *Zurich*, OMC contended on appeal that because its insurance policies-like those here-required the insurer to indemnify OMC for "all sums" it became obligated to pay on account of property

damage arising out of an occurrence, there should be no apportionment.

The Second District Appellate Court held that the trial court's application of a continuous trigger theory was correct, as was the trial court's determination that the contamination of Waukegan Harbor was a single continuing occurrence. *Id.* at 748. The appellate court also affirmed the trial court's decision to apportion damages according to each insurer's time-on-the-risk. Despite the "all sums" language, the court held that the insurer's liability to pay all sums extends only so far as there is property damage during the insurer's policy period. *Id.* at 748–49. Accordingly, the court held, the total damages should be divided by the number of triggered years to determine the coverage provided by each triggered policy. *Id.* at 752.

The Second District subsequently applied its *Outboard Marine* rule in *Missouri Pacific R.R. Co. v. Internat'l Ins. Co.*, 288 Ill.App.3d 69, 223 Ill.Dec. 350, 679 N.E.2d 801 (1997). *Missouri Pacific* involved employee claims for noise-induced hearing loss and asbestos-related injuries which the trial court found, in the circumstances before it, constituted a "single continuous occurrence." The appellate court held that despite the "all sums" language, each policy was required to respond only to those personal injuries which occurred during that policy's policy period. *Id.* at 806. The appellate court did not explain in any satisfactory way why it concluded that *Zurich* was inapplicable except to note that the Supreme Court's ruling in *Zurich* "was based on the narrow facts of the case before it" and "did not adopt a general rule forever precluding the application of a pro rata approach." *Id.* at 808.

There is nothing in *Zurich* that suggests that the Illinois Supreme Court intended to limit its holding to the "narrow facts of the case before it." To the contrary, the *Zurich* decision is explicitly rooted in the language of the policies involved, language which does not appear materially different from that in the case at bar or that in *Outboard Marine* and *Missouri Pacific*. What is materially different, however, is the circumstances to which this policy language was applied by the Illinois Supreme Court on one hand and by the Second District on the other. *Outboard Marine* and *Missouri Pacific* were "single continuous occurrence" cases. In these cases, the facts, as viewed by the appellate court, involved damage continuously caused and continuously sustained. The cause of the damage and the damage caused were essentially contemporaneous, with the causative agent and the resulting damage occurring repeatedly and continuously. In such cases, because both the damage-causing agency and the damages the agency caused occurred continuously in each policy period, a rule which required the policy in effect when the first damage occurred to cover damages caused in that and successive policy periods would make no sense. The sensible rule, as the appellate court held, is to attempt to make each policy respond to the damage that occurred during its policy period.

The rule should be different, and is in fact different, in progressive damage cases like *Zurich*. In *Zurich*, the Supreme Court viewed the evidence before it as indicating that damage to a claimant's lungs began at the first exposure to asbestos and progressed until the disease became manifest; while additional exposures would undoubtedly aggravate the damage, the initial injury could ultimately cause disease, perhaps even without additional exposure. Since the initial damage may over time cause increasing injury in such cases, it makes sense to hold the policy in effect at the time of the initial injury responsible for all the claimant's damages, even though the progression of the damage could over time trigger additional policies. In this important respect, the instant case is like *Zurich* and not like *Outboard Marine*. The facts, as they have been presented to this court, indicate that the initial September 1991 tunnel damage was

the cause of the April 13, 1992 flood and the attendant flood damage.

■ This difference in treatment of progressive damage cases has been recognized by legal scholars. Allan Windt, in his treatise *Insurance Claims and Disputes*, states, as to the usual case, that "[w]hen multiple years of coverage are triggered, each insurer should be liable for the portion of the damages ... that is allocable to each respective insurer's policy period." A. Windt, *Insurance Claims and Disputes* (3d ed.1995) § 6.47 at 508. However, Windt qualifies this rule where progressive damage is involved. "Note, however," Windt adds, "that when there is an ongoing process of property damage, it has been held that each policy period that is triggered is also liable for all of the damage that continues after the policy has expired." *Id.* at 512 and n. 473 (citing and discussing cases).

Treating progressive damage cases in this manner is entirely reasonable. If, in a progressive damage case, the insurer on the risk at the time of the initial injury were responsible only for that initial injury, the frequently more serious damage manifested as the injury progressed would often go uncovered, particularly but not atypically if the insured had ceased engaging in the causative activity and ceased to have coverage.

The case at bar is unlike *Zurich* in that the *resulting* injury was to claimants different from the third party injured by the initial injury. Nevertheless, like *Zurich*, this is a progressive damage case, where the initial damage results in the damage that follows, and it is one in which the express agreement of the policies is to cover "all sums" which the insured is liable to pay "for damages on account of ... property damage ... caused by or arising out of each occurrence...." The court believes the rule of *Zurich* is applicable here and declines to allocate damages. The

first period and the second period policies all must respond fully to the flood damage.

## 5. *Is the City an Additional Insured Under the Excess Policies?*

■ The City maintains that it is an "additional insured" for the full limits of coverage not only under Great Lakes' $1 million comprehensive general liability ("CGL") policy but also under the four excess policies discussed above. With respect to the CGL policy, it is not clear what is in dispute. If there is any disagreement that the City is an additional insured with respect to the $1,000,000 limits of the CGL policy, the parties should so advise the court.

With respect to the four excess policies, the dispute is clear. The City maintains that it is entitled to the full coverage of each of the four excess policies. Both Great Lakes and London Insurers maintain that the City is not covered under the excess policies.

Under Endorsement 1 of the excess policies, the named insured, Great Lakes, may make a party that is not a party to the policies an "additional assured" [13] pursuant to the following provision:

3. Additional Assureds

The unqualified word "Assured" also means:

(a) additional assureds/additional named assureds which shall include any company, joint stock company, joint venture, trust or other legal entity, or interest therein, heretofore, now or hereafter constituted for which any Named Assured is responsible:

—to arrange insurance, or

—to add as an additional assured, or

—to add as an additional named assured;

but only to the extent (subject to all other provisions of the policy) and for

**13.** The American term "insured" and the English term "assured" are used interchange- ably.

such limits of liability and for such coverages as the Named Assured, before loss, has agreed:

i. by certificate of insurance to provide or, to the extent which a court may hold, after loss, that the Named Assured is obligated to provide, or

ii. in the absence of a certificate of insurance, by contract or agreement to provide for such interest.

(Ex. 7103 at GLD 0013025.)

Great Lakes and London Insurers maintain that the City's coverage as an additional insured is limited to what Great Lakes by contract with the City agreed, before loss, to provide. The City maintains that Great Lakes provided the City with certificates of insurance which had the effect of making the City an additional insured to the full limits of the excess policies.

Under General Condition 13 of the Contract between the City and Great Lakes, Great Lakes, "the Contractor," "agrees to keep in force during the life of this contract such insurance policies as indicated in the SPECIAL CONDITIONS of this contract." Further, General Condition 13 provides that the Contractor "agrees to furnish certificates of any or all insurance policies listing the City as an additional insured upon request by the Purchasing Agent." (Ex. 1A at G–2.)

Section 104 of the Contract addresses Contractor's insurance. In relevant part, it provides as follows:

b. *Public Liability and Property Damage Insurance.* The Contractor shall carry at all times while executing such work as covered in this Specification and Contract or any mutually agreed upon change or amendment thereof or addition thereto, Public Liability Insurance, being held responsible for all damages the City of Chicago may have to pay to individuals or corporations in consequence of any acts of neglects of said

Contractor or any of his employees or any subcontractors or his employees, if any, in connection with the work called for by this Contract. The amounts of such insurance shall be as specified in Subsection g. This provision shall be construed as requiring the Contractor and any subcontractor who may employ a subcontractor or subcontractors to take out and maintain Contractor's Protective Insurance and Contractor's Contractual Insurance.

\*    \*    \*    \*    \*    \*

e. *Copies of Insurance Policies.* The Contractor shall furnish copies of all insurance policies and/or certificates of insurance to the Commissioner prior to the commencement of any work under this contract. . . .

\*    \*    \*    \*    \*    \*

g. *Amounts of insurance.* The amounts of insurance shall be as follows unless otherwise specified in the Special Conditions for this Contract:

1. Workmen's Compensation
   Coverage A—Statutory
   Coverage B—$100,000.00
2. Comprehensive General Liability
   Public Liability   —
      Each person   —   $500,000
      Each Accident   —   $1,000,000
   Property Damage   —
      Each Accident   —   $100,000
      Aggregate   —   $300,000

3. Comprehensive Automobile and other Special Hazards (City to be added as an additional named insured) Same limits as Subsection 2
4. Contractor's Contractual Same limits as Subsection 2
5. Owner's Protective Same limits as Subsection 2

(Ex. 1A at FOIA 000286–87.)

Frederick Michael Lietz was the insurance administrator for Great Lakes during the relevant time period. Obtaining insurance certificates for entities contracting with Great Lakes was one of his duties.[14] Lietz reviewed the contract between Great Lakes and the City, and then sent a certifi-

---

**14.** A certificate of insurance is a document used to provide evidence of additional insured status. *See* Testimony of Donald S. Malecki. (Tr. at 908.)

cate request form, Ex. 8010, to Great Lakes' broker, RBH, requesting certificates for the City. The form requested that RBH provide Great Lakes with specified types of certificates evidencing insurance for the City. The form listed ten types of insurance certificates and directed the user to "[c]heck those which apply." The certificates checked were automobile liability, comprehensive general liability/completed operations, "regular" workmen's compensation, employer's liability, protection and indemnity—Jones Act, and U.S. Longshoremen and Harbor Workers, all to the limit of $1 million which Lietz testified he indicated because "that was the highest limit that was specified." (Tr. 1095.) Lietz added "Builders' risk, naming City of Chicago." Among the types of certificates not checked was "excess liability/umbrella." Lietz testified that he did not check this box because "the maximum limit that was being sought was a million dollars, which we could evidence through our comprehensive general liability, our primary, so there was no need for me to check off the excess." (Tr. 1095–96.) Lietz testified that his intention was to obtain certificates reflecting the requirements of the contract. (Tr. 1096.)

Thomas Ptacek of RBH received Ex. 8010 in April 1991. It was Ptacek's practice, when he received a request for certificates, to read any accompanying insurance specifications. Ex. 8010 included the insurance specifications for the contract between Great Lakes and the City. As a result of receiving the certificate request form and reviewing the accompanying material, Ptacek arranged for the issuance of two certificates, Ex. 7040, dated April 11, 1991, and Ex. 7041, dated June 7, 1991. The certificates provide as follows in pertinent part:

MEMORANDUM OF INSURANCE. . . .

THIS WILL CONFIRM OUR HAVING EFFECTED THE FOLLOWING INSURANCE COVERAGES ON BEHALF OF THE NAMED INSUREDS DESIGNATED BELOW. THIS DOCUMENT IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS DOCUMENT DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES DESCRIBED HEREIN.

Assured:

Great Lakes International, Inc., Great Lakes Dredge & Dock Co., et al.

Coverages:

A. Protection & Indemnity. . . .

B. Comprehensive General Liability (per ISO 1973 form as modified)

C. Automobile Liability

D. Workers Compensation / Employers' Liability

E. Liability under U.S.H.W.C.A. . . .

F. Builder's Risk

Limits:

A. Unlimited as per Club rules

B. $1,000,000

C. $1,000,000

D. Statutory / $1,000,000 each accident, policy limit for disease

E. Statutory

F. $ 330,000

\*  \*  \*  \*  \*  \*

Special Conditions:

Certificate issued with respect to Great Lakes Contract No. 32514.

The City of Chicago shall be held named additional insured with respect to any liabilities arising out of work performed under this contract.

Thirty days written notice of cancellation or material changes of the above outlined coverages shall be provided.

The certificates further specified, for coverages A–F, policy periods, insurers and policy numbers.

The City maintains that despite the fact that its contract with Great Lakes required Great Lakes to provide the City

with only $1,000,000 in comprehensive general liability insurance, and that that requirement was satisfied by naming the City an additional insured with respect to Great Lakes' $1 million CGL primary policy, the City is entitled to coverage to the extent of the full limits of the four excess policies. The City reasons that the excess policies' language confers on the City additional insured coverage "to the extent and for such limits" as Great Lakes has agreed "by certificate of insurance" to provide. *The City of Chicago's Conclusions of Law* at 3. The certificates, the City reasons, state that "[t]he City of Chicago shall be held named additional insured with respect to *any* liabilities arising out of work performed under [the Contract]." *Id.* at (4 emphasis added). The City maintains that "[t]his expansive statement of additional insured status is not expressly restricted to particular policies or contractual requirements, and is therefore understood by industry custom and usage to refer to *all* applicable policies of the named insured, Great Lakes." *Id.* The certificates' disclaimer language, the City asserts—that is, the language stating that the certificates confer no rights—is only meant to make clear that the certificates confer no rights greater than those permitted by the policies in question. The City further asserts that the required limits of coverage set forth in the Contract between the City and Great Lakes are, as established by industry custom and practice, minimums and not maximums. Great Lakes' intention to cover the City as an additional insured is manifested, the City claims, by the presence, in the excess policies, of an additional insured endorsement that Great Lakes proposed and that is broader than is typical. Such action on Great Lakes' part made sound business sense, the City argues, because it avoided the likelihood that Great Lakes and the City would end up on opposite sides of litigation in the event that third-party claims arose over Great Lakes' work.

As the City concedes, Great Lakes' witnesses testified consistently that Great Lakes would never voluntarily provide a customer with more additional insured coverage than was required by contract. Ptacek testified that in providing insurance to a contracting party, it was Great Lakes' practice to provide only the amount of insurance required by the contract. (Tr. 329.) Ptacek further testified that it was his intention in preparing the certificates to inform the City only of the coverage Great Lakes believed the City required, that the policies checked were those on which Great Lakes understood it was to make the City an additional insured and that Great Lakes never intended to make the City an additional insured with respect to the excess policies. Corroborating Ptacek's testimony as to Great Lakes' intent is a Great Lakes business record indicating Great Lakes insurance certificate holders in 1991. The document indicates that the City of Chicago was issued a certificate dated June 7, 1991, and that that certificate did not include excess coverage. (Ex. 8002, line 9157.) Moreover, Great Lakes introduced roughly contemporaneous insurance certificates specifically indicating excess coverage such as Ex. 8004(1), issued to the City of Chicago in connection with another project. Finally, Great Lakes' expert, Allen Windt, testified that the certificates, in indicating that the City was an additional insured with respect to *any* liabilities, addressed the *type* of liabilities for which insurance was being provided, not the *amount* of coverage. (Tr. 656.)

The City's primary support for its argument came from the testimony of Donald Malecki, an insurance and risk management consultant who testified as an expert witness. Malecki is the author of, among other things, *The Additional Insured Book,* as well as a lecturer on the topic of additional insureds. Malecki testified that, in his opinion, the City is an additional insured on all four excess policies. (Tr. 910.) He based his opinion on the "any liabilities" language of the certificates and testified that the fact that the excess policies category on the certificates was not

checked is immaterial in view of the broad "any liabilities" language. Malecki also relied on a number of other Great Lakes insurance certificates introduced in evidence to demonstrate that Great Lakes on occasion limited certificates to specific coverages. Exhibit 8635–1, for instance, explicitly limited the additional insured's protection to "the coverage[s] described herein." Exhibit 8635–2 states that the parties involved "are held named as additional insureds with respect to the above outlined General Liability coverage." Exhibit 619 states that the party involved "is deemed an additional insured on all appropriate policies described herein, in accord with section V of the lease agreement." The only purpose of the disclaimer language on the certificates, Malecki testified, is to make sure that in the event of a conflict between the certificate and the policy, the policy governs. In this case, he testified, there is *no conflict*, since the excess policies give Great Lakes the right to name any additional insureds it wished. *See, e.g.,* Ex. 7103 at 13024.

Malecki further testified that the contract specifications in the contract between Great Lakes and the City should not be viewed as the maximum coverage. Rather, "In the custom and practice in the insurance business … the limits are minimums." (Tr. 924.) According to Malecki, this practice exists because the owner typically has no idea how much insurance will be required, and the contractor is in a much better position to provide the appropriate amount of insurance. (Tr. 925.) This reality is recognized, Malecki testified, in the contract itself, which states, "Contractor expressly understands and agrees that any performance bond or insurance protection required by this contract, or otherwise provided by Contractor, shall in no way limit the responsibility to indemnify, keep and save harmless and defend the City as herein provided." (Ex. 1A at FOIA 260.) This provision makes clear, Malecki explained, that it was anticipated that the contractor might provide insurance beyond that required by the con-

tract. According to Malecki, it is generally preferable for both the contractor and the owner to be insured to the same limits because in the case of third party claims, it avoids cross suits between the owner and contractor, especially in cases like this, where the limits are insufficient. Malecki conceded that owner-contractor litigation often results from insufficient limits, and his testimony did not make clear how such litigation would be avoided, even if the limits were shared by the owner and contractor. Further, Malecki testified, if the City is not an additional insured, Great Lakes is left to assume the burden of indemnifying the City. He stated that this would be avoided were the City covered under the excess policies.

The court cannot agree that the City was an additional insured under the excess policies. Malecki testified that he based his opinion on the custom and practice in the industry, but the only evidence of custom and practice he provided was anecdotal evidence that contractual specifications such as those in the City's pile-driving contract are frequently (and in his opinion properly) treated as minimums and not maximums. Thus, all that the court can conclude from this testimony is that Great Lakes *could* have made the City an additional insured under the excess policies had it wanted to do so. Malecki further testified, and the court agrees, that Great Lakes had the authority, under the excess policies, to issue certificates which would provide coverage to additional insureds, but the certificates in this case, in the court's opinion, fail to do so. Great Lakes' own practice in many instances was to include explicit indications of excess coverage for additional insureds, as evidenced by a number of certificates introduced in evidence. Despite Malecki's opinion that it was foolish as a business matter for Great Lakes not to give the City additional insured status to the full limits of Great Lakes' own coverage, there is not a scintilla of evidence in the record that Great Lakes intended to do so. There was abso-

lutely no testimony from anyone at the City that in requiring certain insurance limits in contract specifications, it intended, or expected, that the City would get more coverage than it requested. The certificate request forms in this case had a place to indicate the policies under which the City was an additional insured. "Excess liability" was not checked. The certificates themselves listed the coverages which Great Lakes was informing the City it had obtained, and excess coverage was not among them.

The City defeated summary judgment on this issue by arguing that it had custom and practice evidence which would show that the "any liabilities" language in the certificates included excess coverage. The custom and practice evidence presented at trial, however, largely boiled down to an argument about what the contractor may choose to do and what it is prudent for the contractor to do. It failed to demonstrate that the language of any of the key documents is ambiguous, and it did not disclose any course of dealing between these parties or in the industry as a whole that would lead one to believe either that the certificates should be read as conveying rights or that the "any liabilities" language should be read as meaning that the City is covered under policies not mentioned in the certificates. The evidence provided by Malecki failed to provide any basis for finding that the "any liabilities" language is a description of the amount of coverage rather than, as the language appears to suggest, the type of liabilities for which coverage under the listed policies can be sought. Indeed, there was no custom and practice evidence on the meaning of "any liabilities" at all. Having heard the evidence the City offered regarding custom and practice, this court must concur with the opinion of Judge Lefkow recommending summary judgment against the City on this issue: the excess policies provide that a certificate of insurance will control a party's status as additional insured, but only if Great Lakes *agreed, before loss,* to provide additional insured status by way of

certificate. The certificates in this case expressly disclaim that they convey any rights to the City, and do not, on their face, appear to constitute an agreement to do anything.

This conclusion notwithstanding, the City argues that London Insurers are estopped to deny coverage to the City under the excess policies. Under Illinois law, "[w]hen a complaint against the insured alleges facts within or potentially within the scope of the policy coverage, the insurer taking the position that the complaint is not covered by the policy must defend the suit under a reservation of rights or seek a declaratory judgment that there is no coverage." *Clemmons v. Travelers Insurance Co.,* 88 Ill.2d 469, 58 Ill. Dec. 853, 430 N.E.2d 1104, 1107 (1981). If the insurer fails to do so, it is estopped to deny coverage in a suit to collect the judgment. *Id.* The obligation to defend under a reservation of rights or to seek a declaratory judgment extends to putative additional insureds as well. *Id.* at 1108–09. The basis for the rule is an equitable principle precluding an insurer that has breached one of its duties under the contract—the duty to defend—from enforcing another provision of the contract to its benefit. *Id.* at 1109. *See also Maneikis v. St. Paul Ins. Co. of Illinois,* 655 F.2d 818, 821–22 (7th Cir.1981) (setting forth the same rule as *Clemmons* ).

In deciding whether estoppel applies, the appropriate inquiry is whether the insurer's refusal to defend breached the insurance contract. *Maneikis,* 655 F.2d at 822. Because the duty to defend is broader under Illinois law than the duty to indemnify, the insurer's refusal to defend is wrongful if the allegations in the underlying suit are even potentially within the scope of the policy. *Id.* However, the duty to defend is not boundless. *JG Industries, Inc. v. Nat'l Union Fire Ins. Co.,* 218 Ill.App.3d 1061, 161 Ill.Dec. 613, 578 N.E.2d 1259, 1262 (1991). Estoppel arises only where a duty to defend exists and has

been breached; it does not prevent the insurer from raising the issue of whether it did in fact breach the duty. *Id.*

The problem with the City's argument is that the court can find no basis for concluding that London Insurers had any duty to defend it under the excess policies. In order for the estoppel doctrine to apply in a party's favor, the allegations of the complaint against the party must present a case of potential coverage. *See Roman Catholic Diocese of Springfield v. Maryland Casualty Co.,* 139 F.3d 561, 565 (7th Cir.1998); *Fuller's Car Wash, Inc. v. Liberty Mutual Ins. Co.,* 298 Ill.App.3d 167, 232 Ill.Dec. 399, 698 N.E.2d 237, 243 (1998). The City has not indicated what allegations of the underlying complaint present a case of potential coverage, and given the court's conclusion that neither the excess policies nor the certificates create any coverage for the City under the excess policies, it is difficult to find any basis for a finding of a breach on the insurers' part. Unless the City can establish that London Insurers had a duty to defend it under the excess policies, there is no estoppel. *Roman Catholic Diocese,* 139 F.3d at 565–66. This court finds no arguable basis for finding that London Insurers had a duty to defend the City under the excess policies and therefore must conclude that London Insurers are not estopped from denying coverage under those policies.

### 6. *Is There OCP Coverage Available to the City for the April 1992 Flood Damage?*

▮ The Contract between the City and Great Lakes unequivocally requires that Great Lakes take out and maintain, during the life of the contract, Owner's Protective Insurance (referred to by the parties here as "OCP" coverage) in the same amounts as the required Comprehensive Public Liability and Property Damage Insurance. The Contract also requires that the City be a named insured under the OCP policy. (Ex. 1A at FOIA 000286.)

The OCP coverage for Great Lakes' work on the pile-driving contract is included as part of the CGL policy as an attached form and is incorporated into the CGL policy. Ex. 7102 at GLDD 0012514. The OCP form says nothing indicating that the City is a named insured, but the City introduced expert testimony, which was not contradicted, that because Great Lakes' contract with the City required OCP coverage, the City would automatically be covered by the policy. (Tr. 935.) *See also* testimony of Thomas Ptacek at Tr. 1020. London Insurers argue that the City is not a named insured under the OCP coverage, but do not address the City's argument that such coverage was automatic under Great Lakes' contract with the City. The court accordingly finds that the City was a named insured under Great Lakes' OCP coverage.

▮ London Insurers further argue that even if the City was a named insured under the OCP coverage, OCP coverage covers only damage during the course of the contractor's work, and thus would not provide coverage for the subsequently-occurring damage to the underlying claimants. Under the heading of "Exclusions," the OCP form provides, "This policy does not apply. . . . to bodily injury or property damage occurring after . . . all work on the project (other than service, maintenance or repairs) to be performed by or on behalf of the named insured at the site of the covered operations has been completed. . . ." London Insurers argue that the April 1992 flood damage occurred after work on the project at the site of the covered operations was completed. That work on the project was completed before April 1992 is not disputed.

The City responds that it is nonetheless entitled to coverage because the liabilities for which it seeks coverage stem from property damage caused by an occurrence during pile-driving operations. There is no doubt that an occurrence—the September 1991 damage to the tunnel wall—arose out of pile-driving operations while those

operations were ongoing. The exclusion, however, creates an exception from coverage that would otherwise be available: property damage occurring after work on the project is completed is not covered, even if caused by an occurrence arising out of the contractor's operations.

The City further argues that the "completed operations exclusion" does not apply "because it is superseded by the Primary Policy's grant of coverage for the explosion, collapse and underground property damage hazards." *The City of Chicago's Conclusions of Law* at 11. The CGL policy—the primary policy—includes coverage for underground property damage hazards, such as property damage to tunnels beneath the surface of the ground or water, caused by or occurring during the use of mechanical equipment for the purpose of pile-driving. *Joint Statement of Uncontested Facts*, Ex. 8621, ¶ 80. Underground property damage, as defined in the CGL policy, also includes "any other property damage at any time" resulting from underground property damage hazard as defined above. *Id.* Excluded, however, is "completed operations hazard," which is defined as "bodily injury and property damage arising out of operations ... but only if the bodily injury or property damage occurs after such operations have been completed ... and occurs away from premises owned by or rented to the named insured." *Id.* ¶ 81. The City views the completed operations hazard exclusion as inapplicable and maintains that the primary policy's coverage of underground property damage, including property damage at any time resulting from such damage, must be read to trump the completed operations exclusion of the OCP endorsement.

The court disagrees. The City's own expert testified that OCP coverage "traditionally excludes coverage for property damage after the operations have been completed.... [I]t's intended to cover only while operations are in progress." (Tr. 987.) Moreover, although the City's expert testified that the language in the

"Conditions" section of the CGL policy, stating "including X, C, U hazards," Ex. 7102 at GLDD 0012514, means that the inclusion of underground property damage hazard coverage in the primary policy extends to the OCP coverage, he provided no support for this assertion. The court sees nothing in the language of the policy to support this result either. It is not apparent why a decision to provide underground property damage protection in the primary policy means that the traditional completed operations exclusion of the OCP coverage is eliminated. No one disputes that the primary policy's CGL coverage covered underground property damage and resulting damages after operations were completed. Why this coverage has the effect of eliminating the explicit and conventional completed operations exclusion for OCP coverage has not been adequately explained, and the court accordingly rejects this contention. The City may not invoke the OCP endorsement for property damage occurring in April 1992 because Great Lakes' pile-driving operations were completed by that time.

### CONCLUSION

All four excess policies must respond to the April 1992 flood damage. The City is not an additional insured under the four excess policies and may not invoke the coverage of the OCP endorsement for flood damage occurring in April 1992.

Plaintiff Great Lakes shall draft a judgment order to be submitted to all parties for their approval as to consistency with the terms of this opinion and presented in open court on April 16, 1999 at 10:00 A.M. At that time, the parties may bring to the court's attention any disagreements concerning the draft judgment order and any matters remaining to be decided before entry of final judgment.