In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1407

Sybron Transition Corporation and Kerr
Manufacturing Corporation,

Plaintiffs-Appellants,

v.

Security Insurance of Hartford,

Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 92-C-779--Lynn Adelman, Judge.

Argued October 27, 2000--Decided July 12, 2001


   Before Easterbrook, Kanne, and Rovner,
Circuit Judges.

   Easterbrook, Circuit Judge.  This appeal
concerns insurance for asbestos
liabilities. The estate of Alan Press, a
dentist who died in 1988 of mesothelioma,
contended that his disease had been
caused by exposure to asbestos during
dental school from September 1969 through
May 1973, and that the source of the
asbestos was products made by Kerr
Manufacturing Corporation. That suit was
settled for $1.3 million, of which
Security Insurance contributed $500,000
under a reservation of rights. Kerr and
its parent Sybron Transition Corp.
(collectively Sybron) contend in this
suit under the diversity jurisdiction
that Security must indemnify them for the
entire settlement; Security replies that
it is entitled to most of its $500,000
back. After a bench trial the district
judge concluded that Security's share of
the liability is $230,208, and he entered
a judgment requiring Sybron to refund the
excess. 2000 U.S. Dist. Lexis 19139 (E.D.
Wis. Jan. 14, 2000).
   Security underwrote Sybron's tort
liability when Press arrived at dental
school; its last policy expired at the
end of January 1971, during his
education. Mesothelioma was diagnosed in
July 1987, Press died in April 1988, and

his estate filed suit in 1989. By 1986 Sybron was self-insuring for most asbestos risks. One possible resolution of coverage disputes would have been to say that the responsibility for indemnity fell on Sybron's carrier in 1984, when (the district judge found) Press's tumor began growing, or on Sybron itself if 1987 marked the onset of the disease. But the parties agree that New York law, which governs the application of Security's policy, applies a time-on-the-risk approach to allocating insurance coverage for diseases with long latency periods (and similar matters such as pollution)--and that New York does this essentially no matter how the insurance policy defines the conditions of its own coverage. The parties have accordingly paid little attention to the language of the policies and a great deal of attention to Stonewall Insurance Co. v. Asbestos Claims Management Corp., 73 F.3d 1178 (2d Cir. 1995), and Olin Corp. v. Insurance Co. of North America, 221 F.3d 307 (2d Cir. 2000). These are the leading decisions about this aspect of New York insurance law--true, they are not decisions by New York courts, but the parties treat them as authentic expositions of New York law. So if in a usual diversity case the federal court acts as a ventriloquist's dummy for the state judiciary, we are playing this hand double dummy: the second circuit has interpreted New York law, and we are interpreting the work of the second circuit.

Time-on-the-risk means that each insurer's liability (up to its policy limit) is measured by the underlying loss multiplied by the ratio of time covered by the policy to the time subject to the risk. The denominator of this fraction, the total period of risk, was set by the district court after the bench trial at 96 months: the 45 months Press was in dental school (and exposed to asbestos) plus the 51 months during which cancerous cells were multiplying in Press's body. The numerator, according to the district court, is 17 months: the portion of Press's dental education during which Sybron had coverage from Security. Multiplying $1.3 million by the fraction 17/96 produced Security's share ($230,208), less than the $500,000 per-occurrence limit in Security's policies. Sybron contends that the district judge

made three errors in working this out. Sybron contends first that the numerator should be 36 months rather than 17; second that the denominator should be 69 months rather than 96; and third that Security's three policies should be stacked to increase its maximum exposure to $1.5 million.

1. The numerator. Security wrote three policies that covered portions of the risk: one for calendar year 1969, a second for calendar year 1970, and a third for the month of January 1971, bridging a gap while Sybron arranged for coverage from another underwriter. Sybron contends that because three policies are at issue, it is entitled to have Security treated as covering three years of the risk. The year is the ordinary unit of insurance coverage, Sybron observes, so it should be the unit of allocation for time-on-the-risk calculations too.

A year is the normal accounting period for financial reports and tax returns, but whether it is the right accounting period for insurance is something that parties can and do work out for themselves. Security wrote a one-month policy for 1971 (at Sybron's request) and presumably charged one-twelfth of its annual premium. Yet Sybron believes that it obtained the same coverage as a premium twelve times larger would have produced. That does not seem sensible and is not supported by anything in the policy's language. If one of Kerr's products had killed Press outright inJanuary 1971 then Security would have been responsible for up to $500,000; but a death in February 1971 would have been the responsibility of Security's successor. If liability for asbestos-related disease were allocated to a single policy-- say, the policy in force at first exposure, or the policy in force when the disease becomes manifest--again the single-month policy for January 1971 would subject Security to one month's actuarial risk. A twelfth of all initial exposures that happened anytime in a year would come in January, and a twelfth of all mesotheliomas would be discovered that month.

The same approach applies to a time-on-the-risk calculation: if the events are to be allocated among the underwriters according to total exposure (and

manifestation) time, then a one-month policy covers one month's worth of exposure rather than a year's worth. Both Stonewall, 73 F.3d at 1204, 1217, and Olin, 221 F.3d at 327, support this conclusion. True, both opinions frequently refer to "years" in the numerator, but that is because they dealt with whole-year policies. When insured and insurer have elected to parcel out coverage by month rather than by year, the formula should use months rather than years. (And, we suppose, if coverage were measured in days, then days would be the right unit for the formula. Cf. National Casualty Insurance Co. v. Mt. Vernon, 128 A.D.2d 332, 515 N.Y.S.2d 267 (App. Div. 1987).) Otherwise the insured would receive coverage it did not pay for. That the underwriter covering the remainder of 1971 (American Mutual) became insolvent does not increase Security's liability; Sybron does not point to any provision of New York law making an insurer responsible for coverage its successor promised but failed to deliver.

2. The denominator. The district court included in the denominator all of the months that Press either was in dental school or suffered from cancer. Sybron contends that the denominator should include only the period during which it carried insurance that would have covered the loss. Sybron was not wholly self-insured; it carried insurance for risks exceeding $2 million per occurrence; but this coverage did not kick in until after the liability level of the Press litigation. Both Sybron and the district court call Sybron's strategy "self-insurance" and we will follow suit, though it would be more accurate to call it "insurance with a big deductible."

Sybron concedes that self-insurance is a form of insurance but contends that time during which it self-insured out of necessity should be excluded from the denominator. This legal proposition has the support of both Stonewall, 73 F.3d at 1204, and Olin, 221 F.3d at 325-27. The district court followed this approach but concluded that, even if asbestos coverage was unavailable (a subject on which the court reserved decision), this is irrelevant because Sybron had decided to self-insure come what may. To this Sybron responds that Stonewall determines that asbestos coverage is "unavailable" for

its purposes whenever it cannot be obtained as an ordinary part of a comprehensive general liability policy--and no one denies that by 1986 comprehensive general liability policies excluded injuries caused by exposure to asbestos. Thus it is entitled to have time after 1985 removed from the denominator no matter what other insurance may have been available, and no matter what its plans may have been.

Security was not a party to Stonewall, so we do not see how the second circuit's views about the availability of asbestos coverage can be conclusive against it. All Stonewall could do--all we can do--is predict how the courts of New York would handle a legal issue that has never been presented to them. We are not confident that Stonewall itself held that only comprehensive general coverage counts as "available" coverage for the purposes of New York law. That was not a subject debated by the parties or addressed squarely by Stonewall. Indeed, we do not know what it means (or could mean) to say that coverage for a particular risk is "unavailable." Unavailable at what price?

Underwriters cheerfully sell insurance policies even after a risk has come to pass and the obligation to pay is certain. What they then deliver on such retroactive policies is a claims-administration service rather than risk-spreading, and the premium exceeds the expected amount of the outlay (for the underwriter must be reimbursed for both the expected payments to victims and the expected costs of evaluating and resolving claims). This kind of insurance could have been purchased for asbestos risks in the mid-1980s, though perhaps no less expensive policy would have been available. For by the 1980s it had become clear that firms such as Sybron that used asbestos in their business had accumulated large potential liabilities, and any underwriter of asbestos risks faced substantial liability for diseases that became manifest during the policy period, even if the insured had long since stopped using that mineral. A policy covering asbestos liability therefore had become, by the mid-1980s, a form of retrospective coverage of diseases with long latency periods. It was impossible to spread risks: the casualties had occurred and only

manifestation remained. No firm outside those industries that used asbestos would purchase asbestos coverage; the only firms that wanted this expensive coverage already had a backlog of dormant liability, so adverse selection would confine interest in asbestos coverage to the firms with the greatest overhang of liability for acts in years past. That would lead insurers to price the coverage at the full policy limits, plus loading charges and administration fees. And firms such as Sybron, whose asbestos-related liability was below that of mine operators, shipyards, and construction firms, would not find attractive a premium that exceeded the policy limits. Knowing that its own anticipated liability was smaller, Sybron opted out of the pool and self-insured. This is adverse selection at work, an ordinary phenomenon in insurance markets when would-be insureds know more about their risks than do insurers. Instead of saying either that insurance was "available" or "unavailable," or that Sybron was bound and determined to self-insure, it is better to say that Sybron did not in the late 1980s have an economically attractive opportunity to participate in a pool in which the risks of asbestos-related casualties were spread among similar firms.

What, then, is the consequence under New York law of a low-risk firm opting to self-insure because the alternative is a premium structure tailored to high-risk members of the pool? Stonewall and Olin are of little help on that score, because they assume that insurance is "available" or "unavailable," as if it were on or off like a light bulb rather than a commodity whose price may be attractive or unattractive to a given customer. No decision by a state court in New York addresses the question. We have to tackle it from scratch, and from that perspective the answer is clear: self-insurance is an alternative to market insurance. Sybron "paid" (to itself) a "premium" for coverage that was less than the one commercial insurers sought to charge, and it then bore the ensuing risks. But instead of asking whether Sybron had some kind of insurance, we prefer to ask why it should matter whether Sybron was insured. Suppose it had not set up any casualty reserves for 1986-88 (the equivalent of the coverage

"purchased" with the internal "premium" that Sybron saved and released to other uses). Why would this affect the legal obligations of a firm whose last policy expired in 1971? The whole idea of a time-on-the-risk calculation is that any given insurer's share reflects the ratio of its coverage (and thus the premiums it collected) to the total risk. The full risk is not affected by whether insurance is available later.

To say that developments in the 1980s increased the exposure of an underwriter such as Security would be equivalent to saying that the only relevant "risk" is measured by the period of exposure. (Recall that the reason asbestos coverage was so expensive in the late 1980s was the manifestation of diseases caused by exposures long ago.) Yet no one argues for that proposition. Security wrote an occurrence policy; and for occupational diseases the time of the "occurrence" (or the "accident") traditionally had been understood as the time the disease becomes manifest. That might justify assigning the whole Press loss to Sybron's carriers during 1984-88. The difficulty of assigning causation might justify splitting responsibility among the periods of exposure and manifestation. See E.R. Squibb & Sons, Inc. v. Lloyd's & Cos., 241 F.3d 154 (2d Cir. 2001); Fogel v. Zell, 221 F.3d 955 (7th Cir. 2000); Eljer Manufacturing, Inc. v. Liberty Mutual Insurance Co., 972 F.2d 805 (7th Cir. 1992). But we do not know of any support in New York law for assigning all (effective) coverage to the carriers during the period of exposure-- and certainly not for concentrating responsibility on an early carrier just because coverage was too expensive later.

To require Security to pay extra because Sybron did not find it cost-effective to purchase coverage during 1986 to 1988 would be the economic equivalent of requiring Security to furnish free coverage during 1986-88 (for Sybron does not propose to pay the going premium retroactively). Why an underwriter who furnishes low-price coverage during a period before the magnitude of the risk became apparent should be required to furnish, for nothing, an additional period of high-price coverage escapes us. After all, it was Sybron, not Security, that created the risk of loss. And the

consequences of that risk should fall on its creator, not on an underwriter unlucky enough to insure an early slice of the risk. Sybron could choose to handle risks as it pleased. It is a little unclear why corporations buy insurance at all (for their shareholders can diversify risks more readily in the stock market than through insurance), making it doubly obscure why a firm's rational decision to depend on shareholders for riskbearing services in the band under $2 million should cause a former insurer to pony up.

3.  Stacking (aka joint and several liability). Hoping to avoid all of this time slicing, Sybron argues that it can pick any policy during the period of risk and require its insurer to bear the whole loss up to the limit of liability (which in Security's case was $500,000 per occurrence). If this does not cover the loss, the insured names a second policy, and then a third. Sybron hopes in this manner to make Security pick up the entire tab. It would require Security to bear $500,000 on the 1969 policy, another $500,000 on the 1970 policy, and the remaining $300,000 on the January 1971 policy. The strategy is known variously as "stacking" and "joint and several liability"--though this use of the latter phrase is unusual. See Olin, 221 F.3d at 322-24. See also Comment, Allocating Progressive Injury Liability Among Successive Insurance Policies, 64 U. Chi. L. Rev. 257 (1997).

No matter what the right name of this possibility, it is antithetical to a time-on-the-risk approach. Courts have adopted the time-on-the-risk method because it is impossible to tell whether fibers of asbestos inhaled in a given year caused any given asbestos-related disease. Granted, mesothelioma (unlike asbestosis) does not depend on cumulative exposure. Brief exposure may suffice. But when did the fatal exposure occur? In 1969, or 1970, or maybe in 1973 when Security was not the insurer, or maybe even when Press was not at school; all are possible. Instead of trying to pursue this causal will-o'-the-wisp, courts allocate liability to all periods that are arguably appropriate--to periods of exposure because they contain the likely causes, to periods of manifestation because they contain the consequences

(and are most closely associated with the injury that would mark the "occurrence" or "accident" triggering coverage in a standard policy). Liability is spread among insurers to reflect the uncertainty in the timing of cause and consequence.

Sybron wants to combine this uncertainty-based approach, which defines a range of eligible policies, with an entitlement to choose a particular policy for indemnity--yet collecting all of the indemnity from a particular policy supposes ability to pin down the cause. Sybron does not propose to demonstrate that asbestos fibers inhaled during 1969 caused Press's mesothelioma, so it has no basis for insisting that the whole policy limit for 1969 be made available. (Actually, Sybron tells us, the kind of asbestos used in its products does not cause mesothelioma. By settling Press's suit Sybron gave up any chance at putting this defense across, but this line of argument makes it doubly hard to see how Sybron can turn around and express confidence that 1969, or for that matter 1970 or 1971, was the causal period.) Olin explains in detail, 221 F.3d at 322–24, why a time-on-the-risk allocation is superior to allowing insureds to pick any (or every) policy during the risk period. No New York court has addressed this question, see Continental Casualty Co. v. Rapid-American Corp., 80 N.Y.2d 640, 609 N.E.2d 506 (1993) (reserving the point), and we think that Olin has anticipated the answer New York will give when the time arrives.

Sybron believes that the language of these particular policies is on its side, but to the contrary the language strongly suggests no coverage at all. Security promised to indemnify Sybron for all sums that Sybron becomes legally obliged to pay as a result of bodily injury that is "caused by an occurrence". A separate clause defines "occurrence" this way: "an accident, including injurious exposure to conditions which results during the policy period in bodily injury." Thus the "bodily injury" must occur "during the policy period". One way to read this would be to say that until the symptoms of the disease are manifest there is no "bodily injury"; then Security's policies would not cover any of the Press loss. The other way to read it would be to say that the "bodily injury" occurs when the asbestos fibers pierce the lung wall and

lodge in the pleura, beginning the process that leads to mesothelioma. But this drives us back to the causation question. Did this occur in 1969, 1970, January 1971, or some other time? No one knows. The only way to solve, or at least mitigate, the causation problem is to adopt a time-on-the-risk approach, which Olin sensibly holds is incompatible with allowing the insured to pick and choose among policies.

What we have to add to Olin is that even if knowledge of causation permits an insured to pick a policy, it may not pick more than one. Stacking is incompatible with confidence about causation. Security insured Sybron to a limit of $500,000 per occurrence, not $500,000 per occurrence per year. Suppose Press had not only inhaled asbestos but also developed mesothelioma in 1969 as a result. How much could Sybron have recovered? Surely the answer is $500,000 maximum; the occurrence or accident would be confined to 1969, and the fact that Security wrote another policy the next year would not justify treating one casualty as multiple occurrences just because the victim lived into 1970. This would be clear enough for an auto accident that caused medical expenses and lost income not only in the year of the collision but also in future years; it is no less true of occupational diseases. There is only one "occurrence" no matter how many years the loss extends. A time-on-the-risk approach spreads responsibility among insurers to reflect uncertainties about causation, but it does not justify treating one loss as more than one occurrence and requiring insurers individually (or in the aggregate) to pay more than the occurrence limit of their policies.

Affirmed